NEWELL CO., a Delaware
corporation, Plaintiff,

v.

WM. E. WRIGHT CO., a Delaware corpo-
ration, Robert E. Baur, Jr., John E.
Liolin, William R. Waldeisen, Jr., John
L. Schwab, Peter G. Volanakis, John W.
Whiting, Jr., and Larry L. Pflieger, De-
fendants.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 8, 1985.
Decided: Oct. 15, 1985.

John H. Small, Michael Hanrahan, Ver-
non R. Proctor and Wayne J. Carey of
Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, and Alfred Elliott, Thomas P.
Luning and John F. Adams of Schiff, Har-
din & Waite, Chicago, Illinois, for plaintiff.

R. Franklin Balotti, Donald A. Bussard,
Thomas A. Beck, C. Stephen Bigler and
Gwen Pospisil of Richards, Layton & Fin-
ger, Wilmington, and David Chapin and
Douglas H. Meal of Ropes & Gray, Boston,
Mass., for defendants.

## OPINION

ALLEN, Chancellor.

Newell Co., the largest single sharehold-
er of defendant William E. Wright Co.—
owning 35.4% of Wright's issued and out-
standing common stock—seeks in this ac-
tion to invalidate a so-called Fair Price
Rights Plan recently adopted by the indi-
vidual defendants, who constitute the
board of directors of Wright. The Rights
Plan was adopted by the board in Septem-
ber, 1985, in the face of an announced
intention by Newell to seek to replace the
board and senior management of Wright.

Newell asserts several arguments in sup-
port of its position that the options and
warrants issued pursuant to the Rights
Plan are invalid under Delaware law. Cen-
tral to Newell's position is the assertion
that the Rights Plan constitutes a veiled
attempt by the members of the incumbent
board impermissibly to protect themselves
from the wholesome discipline that the
market for corporate control imposes and
thus to entrench themselves in office. In
addition plaintiff asserts that, without re-
gard to the motive of defendants in adopt-
ing the Rights Plan, it unlawfully discrimi-
nates against Newell as a stockholder of
Wright and impermissibly restricts New-
ell's rights to vote its shares. The defend-

ants, on the other hand, defend the creation of the complex rights here in issue as an appropriate exercise of their power to manage the business and affairs of Wright for the protection of the company and its shareholders in the face of a particular threat posed by Newell.

The matter is now before the Court on plaintiff's motion for a preliminary injunction restraining Wright from taking any action in pursuance of the Rights Plan. The Rights Plan itself includes two elements: (1) a stock right, that is a right to purchase stock of Wright at a currently unrealistically high price or, under certain conditions, a right to buy stock at a bargain price in Wright or in a surviving corporation following any merger with Wright and (2) a note right, that is a right, under certain circumstances, to acquire at a bargain price a ten-year variable rate note issued by Wright. These two rights have already been distributed to shareholders of Wright. Exercise of the stock right and the note right will be triggered by a "change in control" of Wright as defined in the various implementing documents. Suffice it for the moment to say that there appears to be a substantial prospect that such a triggering of these rights will occur before final hearing may be had on plaintiff's claims.

■ The office of the writ of preliminary injunction is to prevent irreparable injury that threatens to occur before a final adjudication of a claim may be had. Assuming such a risk exists, the writ will only issue if the Court is persuaded from a preliminary evaluation of the merits of the claim that plaintiff has a probability of ultimate success on his claim and providing there is no supervening reason relating to the balance of hardships or the public interest that counsels withholding such provisional remedy.

In this instance, plaintiff has alleged litigable claims and the evidence adduced at this stage provides some support for the theories of liability asserted. I conclude, however, that I need not now attempt to evaluate the likelihood that plaintiff will ultimately prevail on these claims since, for the reasons set forth below, I do not find that plaintiff has borne its burden of establishing a threat that absent the granting of the relief sought, it is threatened with irreparable injury before trial of this matter may be had. In that connection I mention that trial of this matter has been scheduled to commence some five weeks hence and ten trial days have been reserved for that purpose. Thus, the injury with which we are here concerned is that which is claimed to be currently occurring or which may occur in the short run. Before turning to an evaluation of the risks of injury faced by Newell, it may be helpful first to sketch in outline form the background facts of the dispute as they appear at this early stage and second to outline in some detail the principal provisions of the Stock Rights Agreement and the Note Rights Agreement as I understand them.

I

The Wright Company manufactures and distributes various trimmings, fabric accessories and other materials used in the apparel, accessory and home furnishing industries. Its business results over the last five years have been unexciting. For example, during that period sales have been essentially stagnant while net earnings and earnings per share have fallen significantly.[1] This performance engendered marked dissatisfaction on the part of certain board members with the performance of senior management of the company. In February, 1985, that dissatisfaction erupted into action. At that time the three members of

---

**1.** A sense of Wright's financial performance over the last five years can be had from its most recent annual statement which discloses the following selected indicia:

| | 1985 | 1984 | 1983 | 1982 | 1981 |
|---|---|---|---|---|---|
| Sales ($MM) | 52.1 | 55.4 | 58.3 | 61.4 | 51.8 |
| Net Earnings ($MM) | 1.46 | 1.84 | 3.13 | 3.67 | 2.22 |
| Earnings Per Share ($) | .69 | .88 | 1.51 | 1.69 | .94 |
| Stockholder Equity ($MM) | 29.2 | 28.5 | 27.3 | 24.9 | 24.2 |
| Return on Equity (%) | 5.1 | 6.6 | 12.0 | 14.9 | 9.5 |

Wright's board who were members of the Wright family and who represented that family's approximately 20% interest in the company, filed a Schedule 13D with the Securities and Exchange Commission disclosing their affiliation as a group. That filing stated a purpose of the group: "to replace Robert E. Baur, Jr., as president and chief executive officer of the company."

At that time the board of directors of Wright comprised nine individuals, four of whom (Messrs. Baur, Liolin, Waldeisen, and Whiting) were officers of the company or its subsidiaries. Three members (Messrs. Harry S. Wright, William N. Wright and G.A. Anderson) were members of the Wright family and the remainder (Messrs. Volanakis and Schwab) were outsiders owning minimal shares in the company. At the March 7, 1985 quarterly board of directors meeting, the dissident directors (as they are referred to in the minutes) urged that Mr. Baur be removed and that the board refrain from adopting certain measures then under consideration which were characterized at that meeting as designed to entrench management and permit it to avoid accountability for performance. The board rejected the position of the Wright-family directors and adopted a resolution expressing its support of the company's management.

Against the advice of the three family directors, at the March 7 meeting the board amended the company's by-laws (1) To increase the percentage of stock necessary for shareholders to call a shareholder meeting from 33% to 51% and (2) To require for the first time that, in order for a stockholder to nominate a candidate for the office of director, the name of and certain information concerning that person be submitted to the board sixty days prior to the anniversary of the last annual meeting. The directors also adopted, subject to receipt of a legal opinion as to its validity, a by-law regulating the taking of action by stockholder consent. The company's legal counsel, however, was unable to opine that the amendment was valid under Delaware law. In addition, the board adopted an employee stock ownership plan ("ESOP") over the protest of the dissident directors.

Also at that meeting the board was increased from nine to ten members and defendant Larry L. Pflieger, who does not appear to be otherwise affiliated with the company, was elected to board membership. At about this time an engagement letter with the firm of Paine Webber, Incorporated was signed, by which Paine Webber was retained to develop alternative methods for dealing with the dissident group. Paine Webber had served as a market maker in Wright's stock since the initial public offering of Wright's common stock in 1969, and in 1983 had been retained by Wright "to assist on defense advisory matters, including the advisability and consideration of charter amendments and other similar topics." (Tully Dep. pp. 7–8.)

Thereafter, with the advice of Paine Webber as to price, the company made an offer to purchase the stock of the dissident group at $12.50 per share. According to Paine Webber, this offering price was "... determined as a price above market, better than they could realize in a sale of stock on the market, probably better than they could realize if they did a market trade involving a registered secondary, since the stock was restricted stock". (Tully Dep. p. 20.) In developing this price, Paine Webber prepared a work paper which examined values ranging from $10 to $16 per share of Wright common stock. Paine Webber thought of that range as "inclusive", i.e., "a price at the minimum that I thought would be of any interest or any worth presenting, although we did present it; and an up side that I had a feeling myself that would be one that management would not consider." (Tully Dep. p. 23.) Thereafter a $12.50 offer was made and refused and the board decided that it would not authorize a higher offer because it did not wish to pay "green mail". (Baur Aff., ¶ 4.)

In May, 1985, Bear Stearns & Company contacted Daniel C. Ferguson, the chief

executive officer of Newell, and stated that the Wright family's 20% holding in Wright Co. was for sale. Newell had been interested in forming some association with Wright and Ferguson now expressed an interest in making this purchase. Shortly thereafter, the purchase was consummated at a price of $15.125 per share.

On June 3, 1985, a few days prior to the next regularly scheduled board meeting, Mr. Ferguson and Mr. Baur met to discuss the relationship between Newell and Wright. At that meeting, Baur purportedly asked Ferguson if he would be interested in serving as a Wright director and Ferguson replied that he would be pleased to do so. Baur reportedly told Ferguson that he would discuss the matter with the Wright board at their June 6 meeting.

The Wright family directors resigned effective May 30 and on June 6 the remaining seven directors convened for their quarterly meeting. Later that day the evidence suggests that Baur called Ferguson's office and left a message that Ferguson would be a management-sponsored candidate for membership on Wright's board at the October Annual Meeting.

Following the June 6, 1985 board meeting, Wright's director of shareholder relations reportedly began receiving information suggesting that Newell intended to take over control of Wright and indicating that Newell had previously taken substantial minority positions in public companies as a prelude to similar attempts. (Baur Aff., ¶ 8.) About this time, Baur asked Paine Webber to compile background information on Newell. A binder of information was delivered to Baur later in June, and that investigation was said to disclose that Newell had a history of making two-tiered tender offers in which minority shareholders received "short shrift". (Baur Aff., ¶ 11.)

The Wright board met again on August 15, 1985. By this time the board was focusing on the threat of change in control posed by Newell and what measures could be adopted to address that threat. The

board fixed October 3, 1985, as the date of the annual meeting and approved a form of notice, proxy statement and form of proxy for that meeting. The notice stated that the meeting would: (1) consider a proposal to amend the certificate of incorporation to establish a minimum price procedure in connection with certain business combinations with related stockholders; (2) consider a proposal to amend the certificate of incorporation to authorize a class of preferred stock; and (3) fix the number of directors at seven.

At its August 15 meeting the board declined to nominate Ferguson for board membership. That decision was based apparently on a variety of reports and investigations prepared both by Wright personnel and by Paine Webber.

The notice of annual meeting, which was mailed to shareholders on September 6, 1985, disclosed to the shareholders for the first time the provisions of the by-law amendment adopted on March 7 which required sixty days notice of stockholder nominations for board positions. That by-law, if valid, made it impossible for any shareholder to nominate candidates for Wright's board at the meeting of which they were receiving notice.

Newell received the Notice on September 10, 1985. On Friday, September 13, 1985, it filed Amendment No. 1 to an earlier filed Schedule 13D; that amendment reported that Newell had purchased (at $15.125 per share) additional shares of Wright common stock in two private transactions, that it then owned 35.4% of the outstanding stock of Wright and that it would wage a proxy contest seeking stockholder disapproval of the proposed "fair price" charter amendment and the proposed authorization for the issuance of a new class of preferred stock. Moreover, it announced Newell's intention to seek the election of its own slate of directors to the company's board. The Schedule 13D amendment made no mention of a possible tender offer by Newell for Wright's common stock.

After learning of the content of Newell's filing, the inside directors of Wright met in Boston on Sunday, September 15 with their investment banker, counsel, auditors and proxy solicitation firm. Alternative responses to Newell's proxy fight announcement were discussed. One alternative discussed was the issuance of the two forms of rights that are now challenged in this litigation. The next day, September 16, Wright issued a press release announcing that it would "vigorously resist" Newell's proxy solicitation and any takeover effort.

This action was filed on Monday, September 16, 1985 challenging the March 7 by-law changes that imposed the sixty-day notice provision for stockholder nominations to the board and the proposed amendment that would have regulated exercise of the stockholder consent power. Expedited discovery was granted and a preliminary injunction hearing set.

On the evening of Tuesday, September 17 the entire Wright board met. The board advisors were present as well. At that meeting Georgeson and Company, Wright's proxy solicitation consultants, discussed with the directors the preliminary results of the proxy solicitation contest and expressed its opinion that the contest was a "tight one" and that management was running neck and neck with Newell. Also at that meeting, Paine Webber, advised the board that, in its view, $15.125 per share was low. Paine Webber reported on the past acquisitions by Newell of Mirro Corp. and BernzOmatic Corp. in which Newell had acquired for cash a significant equity position and then merged these companies at a later date for consideration involving long term unsecured debt securities.

Discussion of the concept and the possible terms and structure of the Rights Plans ensued. The meeting adjourned without action being taken and recommenced the following morning after the outside directors of Wright held a breakfast meeting to further discuss the alternatives. On the morning of the 18th the entire board adopted the Rights Plans "in principle".

The board met again on September 20. All of the directors were present either in person or by telephone. At that time the board apparently learned for the first time of a plan by Newell to institute a cash tender offer (although no details were available) and were apparently advised that this litigation had been filed by Newell. The board responded to these developments by rescinding the March 7 by-law amendments and the proposed "fair price" amendment to the certificate of incorporation as well as the proposal to authorize a new class of preferred stock. The board also cancelled the October 3 meeting date and rescheduled the stockholders meeting for December 5.

On the morning of Saturday, September 21, 1985 all of the Wright directors received, for the first time, a draft of the Rights Plan. The documents received also included a summary of the rights provisions for each of the two rights and a form of indenture relating to the notes to be issued.

On Sunday, September 22, the Wright board met again. One of the topics of discussion at this meeting was the as yet unannounced tender offer by Newell. The board then further discussed the adoption of the rights contemplated by the Rights Plan. Representatives from Paine Webber stated that the $19 value of Wright common stock which was implied in the note rights was within the range of values that Paine Webber considered to be fair for all of the common equity of Wright. Thereafter Wright's legal counsel outlined and described in detail the terms of the two rights. According to Robert Baur, the president and a director of Wright:

> Ropes and Gray explained that various changes had been made from the form of documents distributed to members of the board early on September 21, 1985, some of which were substantive and some of which were ministerial. Ropes & Gray described these changes, and responded to questions from the board. Revised forms of documents were distributed to

the members of the board at this meeting. Ropes & Gray explained to the board that it was possible that further changes would be necessary to make sure that the documents were internally consistent and that if any changes were made, the final documents would be presented to the board prior to execution by the Company.

After further consideration and discussion of the terms and purposes of the proposed Fair Price Rights, various alternatives to adoption of such rights, the financial condition of Wright, the history of previous acquisitions by Newell, the fact that the Newell tender offer would not be for any and all shares, and the advice of Paine Webber with respect to valuation matters, the board unanimously determined to declare a dividend distribution to all holders of record of common stock on September 22, 1985 of one Stock Right and One Note Right for each outstanding share. (Baur Aff., ¶¶ 32–33.)

On September 23, 1985, Newell announced in the New York Times the commencement of a tender offer for 400,000 shares of Wright at a price of $15.125 cash per share. Wright immediately issued a press release announcing the adoption of the Fair Price Rights Plan. That same day Newell filed its First Amendment and Supplement to the Complaint in this action challenging the entire course of the board's conduct since at least the March directors meeting and including the adoption of the Rights Plan and the postponement of the meeting date. The amended complaint sought to strike down the Fair Price Rights Plan.

The documents implementing the Fair Price Rights Plan were apparently in flux during this period. On September 26, the board's advisors presented to it a definitive version, which differed in important respects from earlier drafts available to the board. The board approved this version of the Fair Price Rights Plan on the 26th and it was thereafter executed by the Company.

*The Note Rights*

I turn now to an outline of the two rights involved. The first of these rights, the stock rights, nominally represents the right to purchase one share of Wright common stock at a price of $35 per share. This right is exercisable at any time after a "distribution date" but not after September 22, 1995. The "distribution date" is defined to mean the time at which a "change in control" occurs. Change in control is a critical concept; it is defined as occurring when any of the following take place:

(1) Any person (other than the Company or any employee benefit plan of the Company) or group of persons acting in concert acquires in excess of 50% of the then outstanding shares of the Company's common stock.

(2) The failure of the "continuing directors" to constitute the majority of Wright's Board of Directors, unless such failure results from an election of directors in which the majority of the outstanding shares of common stock not beneficially owned by an "acquiring person" are voted in favor of the election of the successor directors.[2]

(3) Stockholders take any action of any kind whatsoever by means of written consents pursuant to § 228 of the Delaware General Corporation Law, unless stockholders beneficially owning a majority of the outstanding shares of common stock not owned by an "acquiring person" consent in writing to the taking of such action.[3]

---

**2.** Continuing director is not defined in the signed version of the stock rights agreement. In a prior draft it was defined as those holding office on the date of the issuance of the rights. No matter how defined, I again conclude on the limited record available that in the facts here present this provision means that unless management agrees to the change in board personnel, no change in the constitution of the majority of the board can be effectuated without triggering the stock rights.

**3.** Because management controls the voting of stock held in an employee voting trust, I am persuaded provisionally that, as a practical mat-

The term "acquiring person" is defined as any person (including affiliates and associates of such person) who is the beneficial owner of 35% or more of the outstanding shares of the company's common stock. Thus, Newell is currently and was on the date of adoption of the plan an acquiring person.

Since the market price for Wright common stock was approximately $14 per share at the time the stock right was approved, distribution of that right conveys no realizable present economic value to a stockholder. However, existence of these complex rights are nevertheless of great significance to Newell and to the other stockholders of Wright. Plaintiff points to three sections in particular of the Stock Rights Agreement that must be understood if the full implications of the existence of the stock rights is to be grasped. These sections either impose heavy penalties upon Newell should Wright engage in specified kinds of transactions (Sections 11 and 13) or create a means by which Newell can avoid those penalties (Section 23).

Section 11(a)(ii) seems designed to keep any acquiring person (i.e., a person with 35% of the common stock of the company) from engaging in any of a number of enumerated transactions involving Wright. It does this by penalizing an acquiring person should a covered event occur. The first penalty of the occurrence of any such event is that any stock right that is or was at any time beneficially owned by an acquiring person becomes void. The second consequence of any of these events is the threat of substantial dilution of any acquiring person's (i.e., Newell's) interest in Wright. Such dilution would be accomplished as follows: in the event a covered event occurs every stock right not owned by an acquiring person changes from the right to buy a single share of Wright at $35 into a right to buy that number of shares as shall equal $35 (the exercise price) divided by 50% of the current market price of Wright's common stock. Thus, if at the time any of these Section 11 events occur, the price of Wright is, for example, $14 per share, as it approximately is now, the occurring of such a triggering event entitles the owner of the stock right (other than an acquiring person) to purchase five shares of Wright stock for $35 (35 divided by one-half of 14 equals five).

The events that would, under Section 11, permit this radical dilution in any acquiring person's interest, are, for the most part, clearly events that Newell or another acquiring person could control and thus avoid. For example, they include: (i) any director, officer or employee of Newell receiving any compensation of any kind from Wright other than compensation for full-time employment at rates in accordance with Wright's past practices; (ii) any sale or other transfer of assets to or from an acquiring person having an aggragate fair market value of more than $1 million; (iii) the acquisition by Newell from Wright of any additional shares or securities convertible into shares of common stock; or (iv) the reclassification of securities, recapitalization of the company, merger or consolidation of the company with any of its subsidiaries, or and other transaction or series of transactions which has the effect of increasing by more than 1% the proportionate share of the outstanding shares of Wright stock that Newell owns.[4]

ter, this provision means that a change in control will occur whenever stockholder action is taken pursuant to § 228 unless management approves of that action.

**4.** For purposes of deciding this motion I do not construe Section 11(a)(ii)(B) as giving rise to this dilution effect upon the increase by Newell of its position in Wright through its tender offer or other purchases of Wright's shares. While that section read in isolation is clearly capable of the opposite reading, I am persuaded that when read in the context of the rest of Section 11(a)(ii)—and based upon the representation by counsel that subsection (B) was not intended to be nor will it be construed to be triggered by action that does not involve Wright—the intent of the drafters was to limit subsection (B) to increases in proportionate stock ownership resulting from reclassification, recapitalization or other action by Wright itself. Even as so read, however, the provision gives rise to valid con-

The second special feature of the stock rights agreement is found in Section 13. This section provides that in the event of a consolidation, merger or sale of assets or earning power aggregating more than 50% of the assets or earning power of Wright, each holder of a stock right shall have the right to receive such number of shares of common stock of the acquiring company as is equal to the result obtained by (1) multiplying the then current purchase price of stock under the stock right by the then number of shares of Wright common stock for which a right is exercisable and (2) dividing that product by 50% of the current market price of the acquiring company's common stock. For example, if a merger were effectuated with a company whose stock is currently valued at $35 per share by the market, holders of Wright's stock rights would be entitled to buy one share of such Company's stock from the surviving corporation for one-half of that amount.

The third section of major importance is § 23(b). It provides that all stock rights shall terminate if the acquiring company causes the shareholders of Wright to receive cash for each of their shares in an amount at least equal to 125% of the highest price paid by the acquiring company for any shares of Wright common stock. This section appears to be designed to point the way for an acquirer to avoid the penalties imposed by Sections 11 and 13. In encouraging cash offers for all shares at a price the board regards as fair it provides a principal justification for the stock rights.

Under § 23(a) there is another way by which the stock rights could be extinguished. The board of directors of Wright by a two-thirds vote, has the option of redeeming all or some of the outstanding stock rights for $.05/right at any time prior to 5:00 p.m. on the earlier of the distribution date or the expiration date. This provision provides a strong incentive for a potential tender offeror to negotiate in advance with the incumbent board and obtain its approval of the terms of his offer. Once there is a change in control, the board loses its redemption power.

*The Note Rights*

The second right in issue, the note right, is a right exercisable after a "change in control"—which is defined as in the Stock Right Agreement—to purchase from Wright for $.50 a variable rate senior note in an original principal amount equal to $19.50 minus the closing price of Wright common stock on the business day immediately preceding the exercise date of the note right. Thus it attempts to guarantee to each non-tendering shareholder receipt of $19 in value—a value that Wright claims the board has implicitly determined to be the fair value of Wright's stock. The note rights are said to be directed to a situation in which the acquiring company does not pursue a second stage merger but leaves the minority in place. The right, however, is not limited to that situation. Thus it may result in substantial "extra" value accruing to non-tendering shareholders should a follow-up merger occur relatively promptly following a tender offer; if the acquiring person pays 125% of the tender price to terminate the stock rights *and* the non-tendering shareholder gets his note as well, he will, it would seem, necessarily get more than the value the board seeks to achieve for him. Alternatively, if no merger does follow, it should seem clear that the note right will not guarantee that non-tenderors will have $19 in value; the issuance of the notes in such amounts as will likely be called for—without any consideration to Wright—will surely drive down the price of the stock left in the hands of the non-tendering shareholders.

The note rights will expire on September 22, 1995, unless they are redeemed by a

---

cerns on the part of Newell. The Wright board could take action independently of Newell to cause the dilution effect to occur. Such unilateral action would in all likelihood constitute a breach of fiduciary duty if not a *prima facie* tort. Thus I assume the risks of such an occurrence are remote.

two-thirds vote of Wright's board prior to a change in control at a price of $.05/right. A note issued upon exercise of a note right will have a term of ten years from its date of issuance and will bear interest, payable semi-annually, at a rate per annum equal to 2% over the three-month U.S. Treasury bill rate for each quarterly period.

Unlike Newell's stock rights, which under § 11(a)(ii) can be destroyed upon the occurrence of any one of a series of events, the version of the Note Right Agreement that was executed by Wright through its appropriate officer contains no such provision. Thus under that document, once Newell receives its note rights, it cannot be divested of those rights. Newell raises a question as to whether that document truly expresses the corporate action the board authorized. It contends that the board intended to exclude Newell from participating in the note right distribution. Such a contention may ultimately have relevance to several issues posed by this litigation, but for purposes of the pending application I will construe the executed version of the Note Rights Agreement as setting forth the definitive terms of the note rights.

## II

The grounds asserted in support of the proposition that both the stock rights and the note rights are invalid under Delaware law are several. First in a series of subarguments Newell contends that regardless of the motive of the defendant directors, these rights violate provisions of the Delaware General Corporation Law and Wright's corporate charter. Specifically, it is suggested or implied that in so heavily and discriminatorily penalizing Newell's exercise of its rights to vote its shares to elect directors, or to amend or repeal by-laws, or to consent to corporate action, or to engage in business with Wright on terms that are fully fair to Wright, the Rights Plan violates Sections 109, 212, and 228 of the Delaware General Corporation Law and provisions of Wright's certificate of incorporation; in purporting to authorize

a "dividend" payable at a future time to holders of stock that may be created in the interim (as the Stock Rights Agreement does), the board has violated Section 170; and in distributing as a dividend a stock warrant that treats holders of the same class of stock differently, the directors have violated the policy underlying Sections 151, 170 and 102(a)(4) of our corporation law.

Secondly, it is asserted that the rights have been adopted not in the good faith pursuit of corporate or even shareholder interests, but represent an extreme attempt by existing management to insulate itself from the consequences of its own performance. Citing familiar precedents in our case law (*e.g., Bennett v. Propp,* Del. Supr., 187 A.2d 405 (1962); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964)) Newell asserts that even if the Rights Plans were otherwise lawful, it is for that reason voidable by this Court.

On this motion Newell seeks an order preliminarily enjoining the exercise of any rights under either the stock rights or note rights. The claim of immediate irreparable injury upon which this application is premised arises from the fact that Newell is presently engaged in exercising its rights (1) under Section 228 of the Delaware General Corporation Law to act, together with other holders of Wright stock, to remove the existing board and (2) under state common law and the federal securities laws, to complete a tender offer for additional shares of Wright common stock which, if successful, would increase its position to slightly in excess of 50%. Success in either effort will result in a "change in control" that will make both rights immediately exercisable. It is in connection with these on-going efforts that the impact of the Rights Plan is to be assessed for the purposes of this motion.

In evaluating the threatened consequences of not issuing a preliminary injunction, it is helpful to look at each element of the so-called Fair Price Rights Plan separately. The Note Rights Agreement is the

far simpler of the two elements in terms of its impacts upon Wright and its shareholders and upon Newell. Under that Agreement the effect of "change in control" will likely be the issuance of some dollar amount of ten year notes bearing a market rate of interest. One cannot say precisely what the dollar amount of the aggregate of such notes would be, but a range of amounts may reasonably be forecast. It seems unlikely in the period we are now concerned with that the price of Wright stock will fall below ten dollars a share—the approximate price before the negotiation of the Wright family stock sale. Given the interest of Newell in acquiring control of Wright and the fifteen dollar offer it is currently making, it may seem unlikely that the price of Wright stock will fall to ten dollars. But assuming it does fall to that point, the consequences of a change in control under the Note Right Agreement would be the issuance of approximately $20,000,000 of debt. That debt would, it appears, be issued pro rata to all shareholders of Wright including Newell and no future action by Newell would threaten to change its legal rights in the notes it would be entitled to receive.

The issuance of such a relatively large amount of debt to shareholders without the corporation receiving any material consideration would have a dramatic impact on Wright's balance sheet and on its future income statements. However, Wright appears to have "retained earnings" of some $29 million and its net earnings in recent years would appear adequate to service such debt. To conclude that such a pro rata distribution results in any "injury" to Wright and its shareholders derivatively[5] would require the Court to conclude that in some sense these assets should remain in the corporation and not in the hands of its shareholders. Even were I willing on the limited record available to overcome a fundamental principle of our corporation law—

that such decisions are for the directors to make in the good faith exercise of their business judgment—I would not know how on the present record to sensibly reach such a conclusion.

Turning to the consequences of the more complex Stock Rights Agreement, its potential effects, should Newell trigger its exercise before final judgment can be rendered in this litigation, are more varied and more specific to Newell. The first effect of triggering—the creation of immediate rights to buy Wright stock at $35 per share—obviously presents no prospect of any short-term economic consequence. The effects of Sections 11(a)(ii) and 13 are more significant. Those sections, if valid, will place a high, indeed probably a prohibitively high, cost upon Newell should it elect to effectuate a merger with Wright or engage in any of a number of transactions with Wright. The cost of engaging in any of the enumerated transactions with Wright would be the threat of (indeed the high probability of) a substantial dilution of Newell's interest in Wright. That cost or effect is one that is borne by Newell to the exclusion of other Wright shareholders and designedly so. Those are costs, however, that Newell can easily avoid by not engaging in transactions covered by Section 11(a)(ii) or 13 before a final judicial determination of the validity of the Rights Plan is had. Will such self-restraint on Newell's part itself impose an injury not compensible with money damages? I think not. A review of the kinds of transactions from which Newell would be required to abstain *pendente lite* (those listed in Section 11(a)(ii)(A) and 13) by the reason of the threatened penalty imposed by the Stock Rights Agreement, indicates that money damages would adequately compensate for any resulting injury it might sustain. For example, Newell, should it cause a "change in control" to occur, will be unable (unless

---

5. For present purposes I need not take up defendants' claim that any such injury is to the corporation and thus is not cognizable injury to Newell in this action.

it accepts the dilution effected by Sections 11(a)(ii) and 13) to transfer any asset or property to Wright in exchange for stock of Wright; to sell, purchase, lease, etc. any property to or from Wright with a value in excess of $1 million; to sell, purchase, lease, etc. any property at all to or from Wright on terms less favorable to Wright than otherwise available; to receive any compensation from Wright except for full-time employment at rates in accordance with past practices; to receive the benefit of any loans, guarantees or other financial assistance; and to merge with or into Wright. In each instance if Newell can show that a transaction that was entirely fair to Wright was not accomplished during the pendency of this suit to Newell's direct injury and it is determined that the Rights Plan was invalid *ab initio* and its restraint a wrong to Newell, it does not appear why compensatory damages could not be ascertained and awarded against defendants.

As to the claim that the threat of a "change in control" will or is impeding Newell's pending tender offer, I note first that the record currently is in conflict as to whether the Rights Plan will materially decrease the probability of its success. The affidavit of John Wilcox of Georgeson & Co. states one knowledgable view:

3. It is unlikely that the issuance of the Rights will impede Wright Shareholders from tendering their stock to Newell. It is public knowledge that Newell has instituted litigation challenging the validity of the Rights, and, in my judgment, Wright stockholders will be pressured into tendering their shares pursuant to the Newell offer in order to avoid being frozen out. This is based on the fact that, if Newell is successful in its attempt to invalidate the Rights, Wright stockholders who have not tendered their shares will have their entire investment in Wright at risk. Indeed, based on my experience, the uncertainty created by the pending litigation is more likely to cause Wright stockholders to tender shares to Newell.

4. It is my judgment that more than 400,000 shares of Wright Common Stock will be tendered to Newell on or before October 21, 1985, the expiration date of the Newell offer.

The affidavit of Jeffrey Bloomberg states an inconsistent opinion:

13. Both the Common Stock Rights and the Note Rights create a tremendous disincentive for stockholders to tender into any tender offer, including a cash offer for any and all shares. Because stockholders who refuse to tender could receive $70 (or more) worth of stock of the surviving company for $35 plus the notes from exercise of their Note Rights, the two Rights effectively eliminate any incentive for Wright stockholders to tender their shares in response to any offer.

With respect to the disincentive effect of the stock rights, it is pertinent to note that Newell has not announced any plan for a follow-up merger should its tender offer succeed. Moreover, the right created by the Stock Right Agreement will, under the escape clause paragraph 23(b), terminate if a later merger is for cash equal to 125% of the highest price paid by the person effectuating the merger. Given the time value of money and the uncertainty of when if ever a follow-up merger might occur, a present shareholder can have no assurance that the $15.125 cash offered now does not offer a better deal than any future alternative.

As to the note right, if receipt of the note contemplated by the note right is, as I suspect, the receipt of ordinary income for income tax purposes, the existence of the note right might actually encourage tenders by shareholders seeking to avoid that tax consequence. (The other alternative of avoiding regular income tax treatment—not exercising the right when everyone else is, thus driving down the price of your common stock—seems unappealing.)

The real impact upon the tender offer of the existence of the note rights (and the stock rights) would appear to be upon Newell's decision to accept or reject the tenders, not knowing if those rights will be sustained as valid and thus not knowing how much debt Wright will ultimately be determined to have and whether the constraints on action purportedly imposed by the stock rights will ultimately prove to be real or illusory. Thus, the so-called Fair Price Rights Plan raises practical concerns on Newell's part; it increases the uncertainties it faces. But that uncertainty does not constitute irreparable injury or the threat of irreparable injury. The injury threatened—a reduction in the utility and value of Newell's enlarged stock interest in Wright—will or is likely to occur only if the Rights Plan is ultimately sustained as a valid corporate act. If that plan is determined to be invalid for one or more of the reasons urged, then no injury is likely to be sustained. In all events, that Newell now must evaluate the risks it faces and act on its evaluation is itself no legal injury; it is what business persons do every day.

I conclude similarly with respect to Newell's current consent solicitation campaign for quite different reasons. As those who are being solicited would not fall within the definition of acquiring person, I am not sure I see any disincentive to their granting consents posed by the stock rights. If consenting shareholders succeed in removing the incumbent board (a step such a shareholder presumably wants) they will coincidentally make their stock rights exercisable. While that step assures them no immediate economic (or even long-term) benefit, it presents no risk of loss to them of any kind. With respect to the note rights, they may encourage consents (by those who would like to receive the notes while holding their stock) or discourage consents (by those who either do not want to have the taxable event of the receipt of the note or who do not want to burden the company with such massive debt). The

record provides no sound basis to determine which consequence is more likely.

Thus, on the basis of the foregoing analysis, I conclude that plaintiff has not sustained its burden of establishing that the Fair Price Rights Plan is presently injuring Newell or threatening to injure it during the pendency of this litigation in a way that would justify the granting of the extraordinary relief of a preliminary injunction.

\* \* \*

The foregoing evaluation of the risk of irreparable injury currently faced by Newell is premised upon several assumptions. Two important assumptions are: (1) that Section 11(a)(ii)(B) of the Stock Rights Agreement which, under certain circumstances, gives holders of stock rights (other than Newell) the power to buy Wright stock at one-half market price, will not be triggered by Newell's further purchase of Wright stock (*see*, fn. 4, *supra*), and (2) that this Court can effectively cancel Wright's obligation under any notes issued pursuant to the Note Rights Agreement upon a determination that those notes were invalid at the time of their issuance. As to the first assumption, were it incorrect, the above analysis of injury (without intending to imply anything with respect to the merits of Newell's claims) might well be quite different. As to this second assumption, I am mindful of the respect courts of equity have historically paid to the rights and the interests of bona fide purchases without notice. Therefore, I think it appropriate that steps be taken to assure that all interested persons or those who may hereafter acquire an interest have adequate notice of these proceedings.

Accordingly, plaintiff's motion for a preliminary injunction will be denied upon condition that within five days of the date of this opinion defendant Wright (1) files with the Court an undertaking by the Stock Agent under the Stock Rights Agreement that it will not deem an increase in Newell's proportionate ownership in Wright to

trigger rights under Section 11(a)(ii) of the Stock Rights Agreement unless such increase results from a transaction requiring for its effectuation a corporate act of Wright; and (2) files with the Court an undertaking by Wright, in such form as required to be legally effective, that any note issued under the Note Rights Agreement during the pendency of this litigation will bear a legend effective to notify the holder of any such note that its validity is the subject of this litigation and it is therefore subject to cancellation by action of this Court without further notice. Upon the filing of the foregoing in acceptable form, a form of order denying the pending application may be submitted by defendant on notice.