AC ACQUISITIONS CORP., Bear, Stearns & Co., Inc., Gruss Petroleum Corp., and Gruss Partners, Plaintiffs,

v.

ANDERSON, CLAYTON & CO., F.F. Avery, G. William Miller, Richard J.V. Johnson, S.M. McAshan, Jr., T.J. Barlow, W. Fenton Guinee, Jr., John L. Fichter, Benjamin M. Baker, Jr., Charles L. Blackburn, John T. Cater, Ralph L. Cobb, Jennings F. Futch, John B. Powell, Jr., D.M. Buchanan, R.F. Harris, and W.W. Vann, Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 15, 1986.
Decided: Sept. 18, 1986.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, and Edmond D. Johnson of Morris, Nichols, Arsht & Tunnell, Wilmington, and Dennis J. Block, Joseph S. Allerhand, Richard L. Levine, Myrna S. Levine, and Karen E. Donald of Weil, Gotshal & Manges, New York City, for plaintiffs.

Charles F. Richards, Jr., Samuel A. Nolen, Thomas A. Beck, Gregory P. Williams, Gregory V. Varallo, and Kevin G. Abrams of Richards, Layton & Finger, Wilmington, and Baker & Botts, Houston, Tex., for defendants.

## OPINION

ALLEN, Chancellor.

This case involves a contest for control of Anderson, Clayton & Co., a Delaware corporation ("Anderson, Clayton" or the "Company"). Plaintiffs, Bear, Stearns & Co., Inc., Gruss Petroleum Corp. and Gruss Partners ("BS/G") are shareholders of Anderson, Clayton who, through a newly formed corporation—AC Acquisitions Corp.—are currently making a tender offer for any and all shares of Anderson, Clayton at $56 per share cash. That offer, which may close no earlier than midnight tonight, is subject to several important conditions as detailed below. BS/G has announced an intention, if it succeeds through its tender offer in acquiring 51% of the Company's stock, to do a follow-up merger at $56 per share cash.

BS/G publicly announced its tender offer on August 21, 1986, having failed to bring defendants to the bargaining table despite attempts over several months. On the following day, Anderson, Clayton announced the commencement of a self-tender offer for approximately 65% of its outstanding stock at $60 per share cash. The Company also announced that, in connection with the closing of the self-tender offer, the Company would sell stock to a newly-formed Employee Stock Ownership Plan ("ESOP") amounting to 25% of all issued and outstanding stock following such sale. This alternative transaction (the "Company

Transaction") itself is a continuation in another form of a recapitalization of the Company that had been approved by the Company's Board in February, 1986.

The earlier proposed recapitalization transaction, the facts out of which it arose, the emergence of BS/G as a party interested in acquiring Anderson, Clayton, and the issuance of a preliminary injunction against effectuation of the recapitalization are subjects treated in a series of opinions issued by this Court in June, 1986. *See In re Anderson, Clayton Shareholders' Litigation,* C.A. No. 8387 Consolidated, Allen, C., 517 A.2d 663 (June 2, 1986), (June 6 and 10, 1986 [available on WESTLAW, DE Database]). Pending before the Court at this time is plaintiffs' motion for an order preliminarily enjoining the Company from (1) buying any shares of the Company's stock pursuant to its pending self-tender offer, (2) selling any of the Company's stock to the newly-established ESOP and (3) taking any steps to finance the self-tender offer or (4) attempting to apply or enforce a "fair price" provision contained in Article 11 of the Company's restated certificate of incorporation to any BS/G second-step merger at $56 per share.

In summary, plaintiffs contend that this relief is justified because the Company Transaction is an economically coercive transaction that deprives shareholders of the option presented by the BS/G offer, which provides demonstrably greater current value than is offered in the Company Transaction; and that in structuring the Company Transaction and in its timing the Board has breached its fiduciary duties of care and loyalty to the shareholders because the Company Transaction is designed and effective to deprive shareholders of effective choice, to entrench the existing Board and protect it from the discipline of the market for corporate control.

Defendants are the Company, each of the Company's 15 directors and Mr. J.F. Futch, who had been a director of the Company but resigned in early August, 1986, before final approval of the Company Transaction was given by the Board on August 22. In brief, the defendants assert that the Company Transaction is an entirely legitimate alternative to the complete liquidation of current shareholder positions that success of the BS/G offer would entail. The Company Transaction, it is asserted, affords the shareholders the benefits of a substantial cash distribution (at capital gains tax rates) while permitting a continuing equity participation in the future growth of the Company's businesses. In fashioning this proposal, the defendants assert that they were provided with expert opinion to the effect that both the BS/G cash tender offer and the Company Transaction offered fair value to shareholders and that they concluded that the Company Transaction was more likely to maximize shareholders' wealth in the long term. In all events, it is urged that rational shareholders might so conclude and that this Court ought not to preclude that option by enjoining effectuation of the self-tender offer or the Company Transaction of which it is a part.

Technically, defendants contend that the Company Transaction is the product of Board action that is entitled to the presumption and protections of the business judgment rule and, under that standard—or indeed under the the alternative, more rigorous test of entire or intrinsic fairness—plaintiffs can demonstrate no probability of ultimate success on the merits.

In assessing the merits of these contending claims, we start with an outline of the facts as they appear at this stage.

I.

For the last 20 years or more, almost 30% of Anderson, Clayton's stock was held in trusts established by the Company's founder, William Clayton, for the benefit of his four daughters. Those trusts were scheduled to terminate in February, 1986, at which time each of the trusts' beneficiaries would become the legal owners of a portion of the stock that formed the body of the trusts. Each of the beneficiaries was reaching advanced years and sensible

estate planning required each to explore a means to liquidate at least a portion of the Anderson, Clayton holdings that would come to her upon termination of the trust.

The termination of the Clayton trusts, in such circumstances, was an event of significance to the Board, to the management and to other shareholders of the Company. The trustees of the Clayton trusts retained Morgan, Stanley & Co. to advise them concerning available options. That firm, after a study, reported several available options including sale of the Company. Upon receipt of Morgan, Stanley's study, the trustees, in early 1985, asked Mr. T.J. Barlow, Chairman of the Board of Directors and then an officer of the Company, to recommend to the Board that the Company explore these alternatives. That was done.

One possibility—a management-sponsored leveraged buyout—was initially proposed in 1985 but foundered before the Board was asked to consider it. Also in 1985, the Company retained the investment banking firm of First Boston & Co. to advise management and the Board in the evaluation and implementation of various options including sale of all or part of the Company, a share repurchase program and takeover defenses. In connection with that assignment, First Boston explored the availability of a sale of the entire Company by contacting some 13 possible purchasers without receipt of any firm offers. Plaintiffs offer grounds to suspect that this search was not effective and may have been half-hearted. BS/G, for example, was not contacted in that effort nor was Quaker Oats Company—who now has a financial interest in BS/G's tender offer—although it would seem to have been a logical party to contact.

In all events, First Boston found no buyer and, instead of a sale of the whole Company or a liquidation, a recapitalization that would constitute, in effect, a partial liquidation was suggested. That plan is detailed in this Court's earlier opinions. In brief, it had several elements including the sale of substantial operations, the issuance of new debt securities, the borrowing of additional sums, the termination of certain pension plans in order to recapture excess funding, the distribution of the cash thus raised to shareholders ($37 per share) and the sale of a 25% stock interest in the Company to a new ESOP. The sale of stock to the ESOP was said to be necessary and appropriate in order to assure capital gains treatment to the cash distribution and for the reasons concerning employee compensation, etc. that usually justify the establishment of such entities. In short, the recapitalization appears to have been an effort by the existing Board to do to the Company and its balance sheet that which a leveraged acquiror could be expected to do if successful, but to afford to the Company's existing shareholders the enhanced rewards (and the higher risks) that such a scheme makes possible.

While the corporate mechanics to effectuate the recapitalization were quite different from those that would be used to implement the Company Transaction, in economic reality, the two transactions are essentially the same.[1] Under the recapitalization, after the cash distribution of $37 per share and the sale of stock to the ESOP, it was the "best guess" of the Company's investment banker that each share of the Company's stock would trade initially at a range of $6 to $10. Thus, at the time the Board approved the recapitalization transaction on February 7, 1986, the best information available to it was that there was no alternative transaction available and that the recapitalization had a present value of between $43 and $47 per share.[2]

1. The difference in legal mechanics, however, has significant consequences. For example, the recapitalization involved a merger and thus required a shareholder vote and provided the safeguard afforded by the appraisal option. *See* 8 *Del.C.* § 262. The Company Transaction, on the other hand, involves no merger and would require for its implementation no shareholder vote.

2. The Company stock price had been moving up, in part no doubt in anticipation that the February, 1986, termination of the Clayton

Following the Board's recommendation of the recapitalization transaction to the shareholders and shortly before the commencement of the June 3, 1986, meeting called to vote upon the recapitalization transaction, BS/G announced an interest in acquiring all of the Company's stock at $54 per share cash. Based upon the information then available to the Board, the BS/G offer, if it was real, seemed to offer greater economic value to the shareholders than the recapitalization transaction. Nevertheless, the Board and BS/G were never able to commence meaningful negotiations. Each side blamed the other for this failure.

First Boston, at a June 7 board meeting, revised its informal estimate of the possible trading range to between $13 and $18 per share. The new view was said to be justified largely by a fall in interest rates since the February meeting that had caused a general increase in the value of securities, particularly those of leveraged companies. Thus, as of that date, the Board had some basis to believe the recapitalization transaction might have a value as high as $55 per share. Plaintiffs warmly contend that First Boston's view is totally baseless. *See* Aff. of Washkowitz.

While this Court declined on two occasions to issue preliminary injunctions as a result of the late emergence of the BS/G alternative, finally on June 10, an injunction was issued against effectuation of the recapitalization. The basis for that injunction, as explained in the June 10 opinion, was that the vote of the shareholders authorizing the recapitalization was fatally flawed by inaccurate or misleading statements made by management of the Compa-

ny in communications to shareholders relating to the Company's response to the BS/G proposal.

Following issuance of the injunction, the Company continued to explore with its advisors the feasibility of curing the problems that had led to the injunction and continuing with the recapitalization transaction.

Meanwhile, BS/G continued to express an interest in negotiating a transaction. On June 23, 1986, Mr. Michael Tarnopol, executive vice president and a director of Bear, Stearns, sent to Mr. Barlow, Chairman of the Company's Board, a letter expressing such an interest. It said in pertinent part:

> Please be advised that we remain ready, willing and able to proceed with our merger proposal and we would be prepared to negotiate all aspects of the transaction, including the amount of consideration to be offered to Anderson Clayton's stockholders.

The letter also noted that BS/G had never received a response to its $54 merger proposal and that its representatives' telephone calls to Messrs. Barlow and Guinee, the Company's C.E.O., over the preceding weeks had not been returned. The Company did not reply to this invitation until August 22. The fruitless discussions that followed at that time are touched upon below.

By late June management had decided to forego attempts to save the recapitalization plan and authorized First Boston and its legal advisors to explore alternative company-initiated transactions to the recapitalization.[3] By July 18, the Company Transac-

trusts might put control of the Company in issue. The high and low trading prices for the Company's stock over one relevant period are as follows (*See* BS/G Offering Statement at p. 8):

| Calendar Quarter Ending | High | Low |
| --- | --- | --- |
| 12/31/84 | 35 | 30 |
| 3/31/85 | 42 | 34 |
| 6/30/85 | 40 | 35 |
| 9/30/85 | 46 | 38 |
| 12/31/85 | 57 | 42 |
| 3/31/86 | 61 | 52 |
| 6/30/86 | 57 | 51 |

**3.** In early July, representatives of the Clayton family communicated to members of the Board

tion had taken shape conceptually and, at a board meeting on that date, the Board for-. mally decided to withdraw the recapitalization and to seek a transaction economically similar to it in its effects on the Company and its shareholders that would include an issuer tender offer and the sale of Company shares to an ESOP.[4]

Without having heard from the Company in response to his June letter, Mr. Tarnopol of Bear Stearns again wrote Mr. Guinee on August 5, this time proposing a merger at $56 per share cash. The letter advised that financing commitments for the transaction were in place and reiterated BS/G's willingness to negotiate all aspects of the offer including price. Two days later, in a second letter, BS/G requested, in the event the Board would not accept the cash merger proposal, that it waive application of Article Eleventh of the Certificate of Incorporation[5] by approving a second-step $56 per share cash merger transaction planned to follow acquisition of a majority of the Company's outstanding shares pursuant to the BS/G tender offer at $56 per share. Again, BS/G indicated its willingness to negotiate all terms, including price and

added a request for a meeting with the Board and response from the Company by 4:00 p.m. August 13. As noted earlier, the Company did not reply directly to any of these invitations until August 22.

At a special meeting on August 15, the Board discussed the recent proposals from BS/G and elected to not respond, assertedly so as to get an alternative transaction in place and to thus permit any negotiations to take place from a position of strength. As to an alternative transaction, at that meeting Mr. Dodson of First Boston outlined the "currently contemplated" terms of the Company Transaction: The cash distribution could be raised from $37 in the recapitalization to $39 in the self-tender (assuming all shares are tendered) because good results from operations increased available cash. The self-tender offer would be to purchase 8,000,000 shares at $60 per share and the corporation would sell approximately 1.4 million shares to the ESOP. Mr. Dodson stated that First Boston still believed that the remaining equity interest of a single share (assuming all shares are tendered) might "trade" in the range of $13–$18.[6]

---

and to management the desire that the Clayton sisters be named as representative stockholders for the purpose of obtaining a ruling regarding the tax consequences of a self-tender offer. As a result of ensuing discussions, on July 18 holders of approximately 33% of the Company's shares entered into an agreement (the "Stockholders' Agreement") not to sell or dispose of their stock, unless the agreement were terminated earlier, until November 14, 1986, except in a transaction approved by a majority of the Board of Directors of the Company (or by will, gift, or the laws of descent and distribution). The purpose of the Stockholders' Agreement was to provide the Company the time necessary to pursue what came to be the Company Transaction and to obtain a ruling from the IRS assuring representative stockholders of favorable capital gains treatment.

4. That meeting was attended in person or by telephone by fifteen directors, eight of whom were officers of the Company or its subsidiaries.

5. Article Eleventh is a form of fair price provision that governs consideration in certain business combinations involving interested shareholders—which would include BS/G if its offer succeeds. The provisions of Article Eleventh

may be met by (1) a vote of 80% of the stock (an unlikely possibility in this instance 'since the Clayton family's stockholdings are, for the time being at least, committed to a management-sponsored deal), (2) approval by "Continuing Directors", or (3) by paying a price fixed by a formula that in the case of BS/G would yield a price in the mid–80s. On September 11, the Company informed BS/G that the Board would not fail to approve a second-stage merger solely because the price did not satisfy that element of the fair price formula (§ 2(b)(i)(c)) that yields the unusually high price on these facts.

6. This concept is used by all parties and their experts and referred to as a "stub share" or "fractional share" value. Thus, in First Boston's view, the per share value of the Company Transaction (assuming all shares participate) would be $60 per share × 65.5% (proration figure) = $39.34 cash + the per share value of the remaining 34.5% equity interest ($13 to $18 per remaining interest) or in total a range of $52.34 to $57.34 per existing share. The "stub share" itself won't "trade" but rather represents 34.5% of the estimated value at which one share, following consummation of the Company Transaction, might trade. *See, e.g.,* First Paulson Aff. at p. 10.

Noting that because the Company Transaction would leave shareholders with a continuing equity interest while the BS/G proposal would "cash-out" the shareholders, Mr. Dodson further stated that the Board "could" prefer the Company Transaction on "economic grounds." After some discussion, the management directors left the meeting. In their absence, Mr. Dodson responded to questions concerning the valuation methodology used by First Boston in estimating a trading range for the shares after consummation of the Company Transaction. After the management directors rejoined the meeting, the full Board adopted a resolution reaffirming its determination to implement a plan using the self-tender and ESOP mechanisms and rejecting the proposals by BS/G to acquire the Company at $56 per share.[7]

On August 21 BS/G, still not having heard any response to its various communications, commenced a tender offer to purchase all of the outstanding shares of Anderson common stock at $56 cash per share. It also announced an intention, if successful, to effect a second-stage cash merger at $56 per share. The tender offer is conditioned on the acquisition of a majority of the outstanding shares, the abandonment of the Company Transaction and either prior approval of a $56 second-step merger transaction by the Board or a declaration by the Court, that the fair price provision, contained in Article Eleventh would not apply in these circumstances.

The next day, August 22, the Board met again obviously in reaction to the BS/G announcement. Mr. Dodson of First Boston advised the Board that it should inform BS/G that it rejected a sale of the Company at $56 per share and recommended that the Board advise BS/G that, while it was not soliciting the sale of the Company, it would meet with and provide non-public information, on a confidential basis, to BS/G for the purpose of increasing their offer.

The Board also resolved to recommend that stockholders reject the BS/G tender offer. As to their alternative transaction, First Boston apparently delivered a copy of its August 22 written opinion, which reads, in pertinent part:

[I]t is our opinion that ... the consideration to be received by the stockholders of the Company pursuant to the [Company] Transaction is fair to such stockholders ... taken as a whole from a financial point of view. We express no opinion as to the price at which Common Stock will trade following consummation of the Company Offer.

First Boston gave no opinion as to the trading price of the so-called "stub share" following consummation of the Company Transaction. First Boston went on, however, while not providing an opinion, to delineate some of the factors First Boston considered in "estimating" a reasonable trading range. Guinee reported to the Board that management and the Company's advisors recommended that the self-tender, according to the terms discussed at the previous meeting, be commenced that day. According to the draft minutes, he explained the purpose of the self-tender as follows:

[The Company wishes] *to present the stockholders with a viable financial alternative to the tender offer so that the stockholders [will] be free to choose* between a sale of their entire equity interest at $56 per share ... and the opportunity to receive a substantial amount of cash on a tax-advantaged basis ... while retaining 75% of the equity in the "new" Anderson Clayton and thus a share in the Corporation's future. (Emphasis added.)

The outside directors were afforded an opportunity to deliberate upon the matters before the Board. The entire Board then

---

7. Fifteen directors attended the August 15 meeting, seven of whom were officers of the Company or its subsidiaries. Mr. Futch, a former officer and presently a consultant to a subsidiary, resigned from the Board days earlier at Mr. Guinee's suggestion.

authorized the officers of the corporation to make a cash tender offer for up to 8,000,000 shares of the Company's stock at $60 per share and to undertake appropriate actions to implement the self-tender offer.[8]

In electing to reject the BS/G $56 cash proposal and to recommend that shareholders reject the BS/G tender offer, and in electing to pursue their alternative transaction, the Board proceeded without seeking the opinion of its investment banker as to whether the Company Transaction represented greater current value to the Company's shareholders than did the BS/G proposal. Indeed, First Boston's representative was unable to tell the Board that the BS/G proposal did not represent fair value. He was only able to say that the Company Transaction was fair in his opinion, that the two forms of transaction were incomparable in some way and that the Board (and, by extension, any shareholder given the opportunity to choose) "could" prefer the Company Transaction.

Later that day, Guinee directed to BS/G a letter summarizing the Board's action. Guinee stated that, although the Board had not decided to sell the Company, it would consider an acquisition proposal. He noted that the Board could terminate the self-tender offer until September 12, 1986, if the Company were to reach an agreement providing for the acquisition of all of the shares or all of the assets of the Company. Accordingly, Mr. Guinee offered, on behalf of the Company, to furnish non-public information to BS/G on the condition that both they and Quaker Oats execute an enclosed confidentiality agreement. In addition, he offered to arrange meetings between BS/G representatives and senior management of the Company. The stated purpose of supplying both the additional information and the discussions was to increase BS/G's offer.

The offer for information and the invitation to meet with Company representatives

were accepted. The glimmer of hope for productive negotiations, however, was extinguished by the events of the next four days. On August 27 the plaintiffs were provided with some information which they contend was insufficient for use in evaluating the possibility of an increased offer. First Boston counters that the information exceeds that "customarily provided in similar situations" and is more than adequate for the desired purpose. Nevertheless, upon plaintiffs' repeated protests and requests, the Company did provide additional information on August 28, 29 and September 3. In 3½ hours of meetings on August 28 and 29, there were no discussions of the projections of future earnings or of any aspect, including price, of the BS/G proposal to acquire the Company at $56. Thus, the meetings were fruitless.

The pending application was argued on September 15. The competing tender offerors may buy stock under their offers no earlier than midnight September 18 (BS/G) and midnight September 19 (Anderson, Clayton).

## II.

The remedy of preliminary injunction will issue only when a court is persuaded that plaintiff has demonstrated a reasonable probability of ultimate success at trial and that plaintiff is threatened with irreparable harm that will occur before the matter may finally be determined. Even when this showing is made, however, a court of equity will not act preliminarily unless it is also persuaded that the injury that plaintiff seeks to avoid outweighs the risk of injury that may befall defendant in the event defendant is improvidently enjoined. *Shields v. Shields*, Del.Ch., 498 A.2d 161 (1985) *app. den'd*, Del.Supr., 497 A.2d 791 (1985).

## III.

I turn then first to a discussion of the legal principles that persuade me that

---

**8.** Fourteen directors attended that meeting in person or by telephone, seven of whom were officers of the Company or its subsidiaries.

plaintiffs have demonstrated a reasonable probability of success in this litigation.

Ordinarily when a court is required to review the propriety of a corporate transaction challenged as constituting a breach of duty or is asked to enjoin a proposed transaction on that ground, it will, in effect, decline to evaluate the merits or wisdom of the transaction once it is shown that the decision to accomplish the transaction was made by directors with no financial interest in the transaction adverse to the corporation and that in reaching the decision the directors followed an appropriately deliberative process. *See Aronson v. Lewis,* Del. Supr., 473 A.2d 805 (1984); *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119 (1971); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985).[9] This deference—the business judgment rule—is, of course, simply a recognition of the allocation of responsibility made by section 141(a) of the General Corporation Law and of the limited institutional competence of courts to assess business decisions.

■ This unwillingness to assess the merits (or fairness) of business decisions of necessity ends when a transaction is one involving a predominately interested board with a financial interest in the transaction adverse to the corporation. In that setting there is no alternative to a judicial evaluation of the fairness of the terms of the transaction other than the unacceptable one of leaving shareholders unprotected. Thus, where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation, it will be required to establish the entire fairness of the transaction to a reviewing court's satisfaction. *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701 (1983); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107 (1952); *Guth v. Luft,* Del.Supr., 5 A.2d 503 (1939).

Because the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of derivative litigation. Perhaps for that reason, the Delaware Supreme Court recognized in *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985) that where a board takes action designed to defeat a threatened change in control of the company, a more flexible, intermediate form of judicial review is appropriate. In such a setting the "omnipresent specter that a board *may* be acting primarily in its own interests," 493 A.2d at 954 (emphasis added), justifies the utilization of a standard that has two elements. First, there must be shown some basis for the Board to have concluded that a proper corporate purpose was served by implementation of the defensive measure and, second, that measure must be found reasonable in relation to the threat posed by the change in control that instigates the action. *See Unocal,* 493 A.2d at 955; *See also Moran v. Household International, Inc.,* Del. Supr., 500 A.2d 1346, 1355–57 (1985); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 181 (1986). Thus, when a stock repurchase is designed in part to defeat a change in control:

> [Directors,] in the face of [an] inherent conflict ... must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership.

And:

> A further aspect is the element of balance. If a defensive measure is to come within the ambit of the business judg-

---

**9.** In saying that, in such circumstances, courts will generally in effect decline to review the merits of the transaction, I recognize that some cases acknowledge a possibility—perhaps more theoretical than real—that a decision by disinterested directors following a deliberative process may still be the basis for liability if such decision cannot be "attributed to any rational business purpose," *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971), or is "egregious" *Aronson v. Lewis, supra* at 805.

ment rule, it must be reasonable in relation to the threat posed. *Unocal,* 493 A.2d at 955.

 It is this standard of review applicable to corporate steps designed to defeat a threat to corporate control that I believe is applicable to the pending case. While this proposed stock repurchase derives from an earlier proposed recapitalization that itself may be said to have been defensive only in a general, preemptive way, there are elements of the present Company Transaction that are crucial to this case and that do not derive from the abandoned recapitalization. These elements are unmistakably reactive to the threat to corporate control posed by the BS/G $56 cash offer. Specifically, the timing of the self-tender offer and the decision to tender for 65.5% of the outstanding stock at $60 per share (rather than, as just one example, distributing the available $480,000,000 through an offer for 69% of the Company's 12,207,644 shares at $57) are elements of the transaction that go to the heart of plaintiff's complaint about coercion and that were obviously fixed in reaction to the timing and price of the BS/G offer.

I turn then to the two legs of the *Unocal* test.

### A.

 The first inquiry concerns the likelihood that defendants will be able to demonstrate a "reasonable ground for believing that a danger to corporate policy or effectiveness" exists by reason of the BS/G offer. *Unocal,* 493 A.2d at 955. Stated in these precise terms, the Company Transaction may seem not to satisfy this aspect of the *Unocal* test. There is no evidence that the BS/G offer—which is non-coercive and at a concededly fair price—threatens injury to shareholders or to the enterprise. However, I take this aspect of the test to be simply a particularization of the more general requirement that a corporate purpose, not one personal to the directors, must be served by the stock repurchase. As so understood, it seems clear that a self-

tender in these circumstances meets this element of the appropriate test.

Unlike most of our cases treating defensive techniques, the Board does not seek to justify the Company Transaction as necessary to fend off an offer that is inherently unfair. Rather, Defendants account for their creation of the Company Transaction as the creation of an option to shareholders to permit them to have the benefits of a large, tax-advantaged cash distribution together with a continuing participation in a newly-structured, highly-leveraged Anderson, Clayton. *See e.g.,* Blackburn Dep. at 168. The Board recognizes that the BS/G offer—being for all shares and offering cash consideration that the Board's expert advisor could not call unfair—is one that a rational shareholder might prefer. However, the Board asserts—and it seems to me to be unquestionably correct in this—that a rational shareholder might prefer the Company Transaction. One's choice, if given an opportunity to effectively chose, might be dictated by any number of factors most of which (such as liquidity preference, degree of aversion to risk, alternative investment opportunities and even desire or disinterest in seeing the continuation of a distinctive Anderson, Clayton identity) are distinctive functions of each individual decision-maker. Recognizing this, the Board contends that "the decision in this fundamentally economic contest lies properly with the shareholders" (Answering Brief p. 42) and that the Board "has preserved the ability of the stockholders to choose between these two options." *Id.*

The creation of such an alternative, with no other justification, serves a valid corporate purpose (certainly so where, as here, that option is made available to all shareholders on the same terms). That valid corporate purpose satisfies the first leg of the *Unocal* test.

### B.

 The fatal defect with the Company Transaction, however, becomes apparent

when one attempts to apply the second leg of the *Unocal* test and asks whether the defensive step is "reasonable in relation to the threat posed." The BS/G offer poses a "threat" of any kind (other than a threat to the incumbency of the Board) only in a special sense and on the assumption that a majority of the Company's shareholders might prefer an alternative to the BS/G offer. On this assumption, it is reasonable to create an option that would permit shareholders to keep an equity interest in the firm, but, in my opinion, it is not reasonable in relation to such a "threat" to structure such an option so as to preclude as a practical matter shareholders from accepting the BS/G offer. As explained below, I am satisfied that the Company Transaction, if it proceeds in its current time frame, will have that effect.

If all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty. Should that option be, on its merits, so attractive to shareholders as to command their majority approval, that fact alone, while disappointing to BS/G, can hardly be thought to render the Board's action wrongful. But plaintiffs join issue on defendants' most fundamental assertion that the Board has acted to create an option and to "preserve the ability of the stockholders to choose." Plaintiffs contend to the contrary that the Company Transaction was deliberately structured so that no rational shareholder can risk tendering into the BS/G offer. Plaintiffs say this for two related reasons: (1) Stockholders tendering into the BS/G offer have no assurance that BS/G will take down their stock at $56 a share since that offer is subject to conditions including a minimum number of shares tendered and abandonment of the Company Transaction; and (2) Tendering shareholders would thereby preclude themselves from participating in the "fat" front-end of the Company Transaction and risk having the value of all their

shares fall very dramatically. In such circumstances, plaintiffs say, to characterize the Board's action as an attempt to preserve the ability of shareholders to choose is a charade. They claim the Company Transaction is coercive in fact and in the circumstances presented, improperly so in law.

May the Company Transaction be said to be coercive in the sense that no rational profit-maximizing shareholder can reasonably be expected to reject it? If it is concluded that the Company Transaction is coercive in this sense, one must ask why it is so and if, in these particular circumstances, this coercive aspect precludes a determination that the action is reasonable in light of the "threat" posed by the BS/G offer.

I conclude as a factual matter for purposes of this motion that no rational shareholder could afford not to tender into the Company's self-tender offer at least if that transaction is viewed in isolation. The record is uncontradicted that the value of the Company's stock following the effectuation of the Company Transaction will be materially less than $60 per share. The various experts differ only on how much less. Shearson, Lehman opines that the Company's stock will likely trade in a range of $22–$31 per share after consummation of the Company Transaction. First Boston is more hopeful, informally projecting a range of $37–52.[10] What is clear under either view, however, is that a current shareholder who elects not to tender into the self-tender is very likely, upon consummation of the Company Transaction, to experience a substantial loss in market value of his holdings. The only way, within the confines of the Company Transaction, that a shareholder can protect himself from such an immediate financial loss, is to tender into the self-tender so that he receives his *pro rata* share of the cash distribution that will, in part, cause the

---

**10.** That is, the likely value, of the "stub share" divided by 34.5% equals one's view of the proba-

ble range of a share following consummation of the Company Transaction. *See* note 6, *supra.*

expected fall in the market price of the Company's stock.[11]

I conclude that an Anderson, Clayton stockholder, acting with economic rationality, has no effective choice as between the contending offers as presently constituted. Even if a shareholder would prefer to sell all of his or her holdings at $56 per share in the BS/G offer, he or she may not risk tendering into that proposal and thereby risk being frozen out of the front end of the Company Transaction, should the BS/G offer not close.[12] *See* Scully Aff. ¶¶ 5–7; Schwartz Aff. ¶¶ 5–6; Paulson Aff. ¶¶ 50–51; Washkowitz Aff. ¶¶ 19–20.

Thus, I conclude that if the Board's purpose was both to create an option to BS/G's any-and-all cash tender offer and to "preserve the ability of the shareholders to choose between those options" (Answering Brief p. 42) it has, as a practical matter, failed in the latter part of its mission.

■ The creation of an option of the kind represented by the Company Transaction need not have the collateral effect of foreclosing possible acceptance of the BS/G option by those shareholders who might prefer that alternative. The problem and its solution is one of timing. It would, in my opinion, be manifestly reasonable in relation to the limited "threat" posed by the BS/G any-and-all cash offer, for the Company to announce an alternative form of transaction (perhaps even a "front-end loaded" transaction of the kind the self-tender doubtlessly is[13]) to be available promptly should a majority not tender into the BS/G offer. An alternative timed in such a way would be a defensive step, in that it would make the change in control threatened by the BS/G offer less likely; it would afford to shareholders an alternative that, due to the non-coercive nature of the BS/G offer, would be readily available to shareholders if a majority of the shareholders in fact prefers it; and it would leave unimpaired the ability of shareholders effectively to elect the BS/G option if a majority of shareholders in fact prefers that option. A board need not be passive, *Unocal*, 493 A.2d at 954, even in the face of an any-and-all cash offer at a fair price with an announced follow up merger offering the same consideration. But in that special case, a defensive step that includes a coercive self-tender timed to effectively preclude a rational shareholder from accepting the any-and-all offer cannot, in my opinion, be deemed to be reasonable in relation to any minimal threat posed to stockholders by such offer.

■ What then is the legal consequence of a conclusion that the Company Transaction is a defensive step that is not reasonable in relation to the threat posed? The first consequence is that the Board's action does not qualify for the protections afforded by the business judgment rule. In the light of that fact, the obvious entrenchment *effect* of the Company Transaction and the conclusion that that transaction cannot be justified as reasonable in the circumstances, I conclude that it is likely to be found to constitute a breach of a duty of loyalty, albeit a possibly unintended one. (I need not and do not express any opinion on the question of subjective intent.)

11. As a matter of fairly rudimentary economics it can readily be seen that a self-tender, being for less than all shares, can always be made at a price higher than the highest rational price that can be offered for all of the enterprises stock. *See* Bradley and Rosenzweig, *Defensive Stock Repurchases*, 99 Harv.L.Rev. 1378 (May, 1986).

12. BS/G could, by making its tender offer subject to no conditions, cure the coercive aspect of the Company Transaction, but it has no legal duty to extend an unconditional offer whereas the Board does have a legal duty to its shareholders to exercise its judgment to promote the stockholders' interests. Thus, in assessing the legal consequences in these circumstances of the conclusion that the Company Transaction has a coercive impact, I do not consider it relevant that plaintiffs, were they willing to do so, could counter that coercive effect by assuming additional risk.

13. That is the $60 cash consideration offered is of greater current value than the stock with which a non-tendering shareholder will be left following consummation of the Company Transaction.

Where director action is not protected by the business judgment rule, mere good faith will not preclude a finding of a breach of the duty of loyalty. Rather, in most such instances (which happen to be self-dealing transactions), the transaction can only be sustained if it is objectively or intrinsically fair; an honest belief that the transaction was entirely fair will not alone be sufficient. Similarly here, where the entrenchment *effect* of the Company Transaction creates a species of director interest even on the part of outside directors, the failure to qualify for the protections of the business judgment rule means that all aspects of the transaction must be deemed fair to shareholders (regardless of subjective intent) to be sustained.

Having concluded that the effect of the particular timing of the Company Transaction will be to deprive shareholders of an option that may as likely as not be the more attractive alternative to a majority of them, I conclude, considering all of the surrounding circumstances, that the action is unlikely to be sustained as fair to shareholders. *Cf. Lerman v. Diagnostic Data, Inc.,* Del.Ch., 421 A.2d 906, 914 (1980) (corporate action may not be upheld where that action was unnecessary under the circumstances—as was the timing of self-tender here—and had the dual effect of thwarting shareholder opposition and perpetuating management in office).

### C.

A final point on the merits must be addressed. Plaintiffs assert that defendants have breached their duty of loyalty in failing to waive the application of the fair price provisions contained in Article Eleventh of the Company's certificate. *See* note 5, *supra.* Plaintiffs urge that there is no valid corporate purpose—as distinct from personal entrenchment motive—that will support such refusal in the face of their non-coercive offer. Defendants have, since the filing of the opening brief, reduced the practical significance of this issue by their September 11 action. *See* note

5, *supra.* The legal issue however remains, as Article Eleventh has not been waived with respect to any follow-up merger. That legal issue is however not ripe for discussion at this point, in my opinion.

While a board's fiduciary duty in any set of circumstances will be affected by the particular facts present, as a general matter I can not say on the present record that this board has an obligation to go further than it already has done on this question. Plaintiffs have no general legal right to have all future legal uncertainties resolved on a motion for preliminary injunction, so that they will be better able to evaluate the economic risks with which they might be faced if the BS/G tender offer is closed. *See Newell Co. v. Wm. E. Wright Co.,* Del.Ch., 500 A.2d 974, 985 (1985); *FMC Corp. v. R.P. Scherer Corp.,* D.Del., 545 F.Supp. 318, 323 (1982). Article Eleventh provides a mechanism for "Continuing Directors" to approve a proposed merger and thereby avoid the economic consequence that failure to get approval of 80% of the companies shareholders might otherwise have. Moreover, should the BS/G offer close, the Clayton family shareholders may have reasons to vote in favor of a prompt merger and thus the 80% requirement of Article Eleventh may well be satisfied. In any event, a future claim arising from a conjectural future merger need not be settled now.

### IV.

Having concluded that plaintiffs have demonstrated a reasonable probability of success, I turn to an evaluation and balancing of harms that are threatened to plaintiffs and the Anderson, Clayton stockholders who may wish to tender into the BS/G offer on the one hand and the possible injury to the Company and those of its shareholders who may desire to accept the Company Transaction that may eventuate from the grant of an injunction, on the other. In this effort I am sensitive to defendants' claim that this Court ought not, through the use of the writ of prelimi-

nary injunction deprive the Company's shareholders of the option of the Company Transaction.

First, I conclude that failure to issue an appropriate form of preliminary injunction will deprive all current shareholders of the option to tender into the BS/G offer. Indeed, plaintiffs have represented that if the Company's self-tender is not enjoined even they will tender into it, in light of the loss in value they will otherwise suffer. While the market price for Anderson, Clayton stock has been trading in the mid-fifties for some months, I am not prepared to assume that all shareholders who may want to elect the $56 cash option could attempt to get almost that on the market immediately without driving down the market price significantly.

Second, I believe that an appropriate form of injunction, limited in time and perhaps conditional in nature, can be crafted that will risk little or no injury to any legitimate interest of defendants, the Company or its shareholders. Such an order would strive to remove the coercive aspects of the Company Transaction, but to permit that option to remain viable, so that if a majority of the Company's present shareholders prefer it, they will have a timely opportunity to elect that option.

This may perhaps be done by the issuance of an injunction against effectuation of any aspect of the Company Transaction (including the taking down of loans to finance the purchase of stock, or the sale of stock to the ESOP trustee or others) for a short period (e.g., thirty days) and by conditioning the effectiveness of such order upon plaintiffs' committing to furnish to shareholders before it closes its tender offer notice of the terms of the order entered and an undertaking to either purchase shares tendered' or to return them within such period. This would enable any person who may wish to tender to BS/G to do so and still be free to participate in the Company Transaction if the BS/G tender offer is not closed. In this way, if a majority of Anderson, Clayton's shareholders would

prefer to cash out their interest in the Company at the price BS/G offers, they may elect to do so without fear of thereby risking consigning themselves to participate fully in the less advantageous "back-end" of the Company Transaction. If, on the other hand, a majority of such shares prefer the Company Transaction, and thus the 51% condition of the BS/G offer is not satisfied, the majority will have the Company Transaction available promptly.

The parties, however, should be heard on the form of a preliminary injunction order that will be effective to remove what I have found to be the coercive element of the Company Transaction but that will interfere as little as possible with the legitimate effort to provide Anderson, Clayton's stockholders with an alternative transaction that may be timely consummated if, in fact, that is the preference of a majority of the Company's shareholders. I will hear counsel on this subject at 9:00 a.m. tomorrow. I would hope that counsel would be able to use some of the intervening hours to confer to see if an implementing order may be agreed upon as to form.