ROBERT M. BASS GROUP, INC., a
Texas Corporation, Plaintiff,

v.

Edward P. EVANS, et al., Defendants.

In re MACMILLAN, INC.
SHAREHOLDERS
LITIGATION.

Civ. A. Nos. 9953, 9909.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 29, 1988.
Decided: July 14, 1988.
Revised: July 18, 1988.

Bruce M. Stargatt, Edward B. Maxwell, 2nd, David C. McBride (argued), Josy W. Ingersoll, Bruce L. Silverstein, and Melanie K. Sharp, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Michael R. Klein (argued), Michael S. Helfer, A. Douglas Melamed, Richard W. Cass, David M. Becker, and Murray A. Indick, of Wilmer, Cutler & Pickering, Washington, D.C., William P. Hallman, Jr., Kevin G. Levy, Kelly, Hart & Hallman, Fort Worth, Tex., Phillip Gordon, Altheimer & Gray, Chicago, Ill., for plaintiff Robert M. Bass Group, Inc.

Joseph A. Rosenthal, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del., and Richard Bemporad (argued), of Lowey, Dannenberg & Knapp, and Robert M. Kornreich, of Wolf, Popper, Ross, Wolf & Jones, New York City, for Class plaintiffs.

E. Norman Veasey, R. Franklin Balotti, Stephen E. Herrmann, Nathan B. Ploener, and James C. Strum, of Richards, Layton & Finger, Wilmington, Del., and Dennis J. Block (argued), Greg A. Danilow, and David Berger, of Weil, Gotshal & Manges, New York City, for defendants Macmillan, Inc., Edward P. Evans and William F. Reilly.

A. Gilchrist Sparks, III, and Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Bernard W. Nussbaum (argued), Paul K. Rowe, Andrew C. Houston, and Robert A. Ragazzo, of Wachtell, Lipton, Rosen & Katz, New York City, for Individual defendants other than Edward P. Evans and William F. Reilly.

## MEMORANDUM OPINION

JACOBS, Vice-Chancellor.

Presently pending are motions by plaintiffs Robert M. Bass Group, Inc. ("Bass Group") and a class of public shareholders of Macmillan, Inc. ("Macmillan") to enjoin preliminarily a restructuring of Macmillan. These motions arise from separate actions (now consolidated) brought by various Macmillan shareholders against Macmillan and its directors on and after May 24, 1988, and by the Bass Group on June 6, 1988.

The plaintiffs initially moved for a temporary restraining order. After a hearing held on June 9, 1988, that motion was granted the following day in an oral ruling. Expedited discovery then ensued. A preliminary injunction hearing was held on June 29, 1988. This is the Opinion of the Court on the plaintiffs' motion for a preliminary injunction.

## I. RELEVANT FACTS

The transaction at issue is complex, as is its evolution, which began in May, 1987. Accordingly, a longer-than-normal factual

recital is needed.[1]

## A. Origins of The Restructuring

### 1. *Macmillan*

Macmillan is a Delaware corporation having its principal place of business in New York City. Macmillan has more than 6,000 public shareholders, and as of May 30, 1988, had 25,657,284 issued and outstanding shares of common stock that are listed and traded on the New York Stock Exchange. Macmillan is engaged in the business of publishing textbooks and other instructional and reference materials. It also conducts non-publishing operations, including information services, instruction, retail merchandising, and a home learning and reference material division.[2]

Macmillan has thirteen directors, eleven of whom are non-management, independent directors. The two "inside" directors are defendants Edward P. Evans ("Evans"), Chairman and Chief Executive Officer, and William F. Reilly ("Reilly"), President and Chief Operating Officer. Since their arrival in 1980, Evans, Reilly, and their management team have made Macmillan highly profitable, increasing Macmillan's market capitalization, revenues, and net income.

### 2. *Initial Conception*

In May, 1987, Robert Maxwell announced a takeover bid for Harcourt Brace Jovanovich, Inc. ("HBJ"), another prominent publishing firm. On May 26, 1987, in response, HBJ declared a recapitalization at a higher value, thereby frustrating the Maxwell bid. *See British Printing & Communications Corp. v. Harcourt Brace Jovanovich, Inc.*, 664 F.Supp. 1519 (S.D.N.Y.1987)

Macmillan's management became concerned that Macmillan, like HBJ, was vulnerable to a takeover on terms that might disadvantage Macmillan's public shareholders. One day after HBJ announced its recapitalization, Macmillan's management began intensively to explore whether Macmillan could also employ a similar antitakeover defense. Between May 27 and June 9, 1987, Evans and Reilly explored a possible restructuring with Morgan Guaranty Trust Company and The First Boston Corporation ("First Boston"), respectively the principal lender and investment banker in the HBJ restructuring.[3] During that two week period, Macmillan employees also prepared several financial charts analyzing various potential Macmillan recapitalizations.

The internally prepared charts depicted various possible restructuring scenarios. However, from May 27, 1987 until May 27, 1988, two central concepts remained constant. First, Evans, Reilly, and certain other members of management would end up owning absolute majority control of the restructured company. Second, management would acquire that majority control, not by investing new capital at prevailing market prices, but by being granted several hundred thousand restricted Macmillan shares and stock options.[4] Those shares

1. The facts recited herein are derived from the voluminous evidentiary record. That record generated over 360 pages of briefing. Most of the facts are undisputed. Where there are disputes, they are noted, and the facts set forth herein represent the Court's assessment of (*i.e.*, its attempt to predict) how those disputes would probably be resolved at the final hearing. *Ivanhoe Partners v. Newmont Mining Corp.*, Del. Ch., 533 A.2d 585, 590, n. 2, *aff'd.*, Del.Supr., 535 A.2d 1334 (1987); *Tate & Lyle PLC v. Staley Continental, Inc.*, Del. Ch., C.A. No. 9813, Hartnett, V.C., (May 9, 1988) at 14 [1988 WL 46064].

2. Macmillan's principal trademarks include Macmillan, Collier's Encyclopedia, Berlitz, Katherine Gibbs, Scribner's and Raggedy Ann.

3. The HBJ experience also led Mr. Evans abruptly to reverse his five year practice of selling his Macmillan shares. Thereafter, he began acquiring Macmillan shares on the open market. According to filings with the Securities Exchange Commission (SEC), from July, 1985 through 1986, Evans sold approximately 260,000 shares in 54 consecutive open market transactions for a total of $11.78 million, and Reilly sold approximately 79,500 shares in 44 consecutive open market sales, for a total of $3.1 million. As a result, as of May, 1987 Evans owned 301,744 Macmillan shares and Reilly owned 14,393 shares, only slightly over 1% of Macmillan's approximately 26 million shares.

4. An internal Citibank memorandum dated May 24, 1988, which reflected conversations between Citibank and Macmillan representatives, states that management initiated discussions on a recapitalization plan in May, 1987, because "(1) [t]hey believed that the business was significantly undervalued and prone to a hostile takeover

and options would then be "exchanged" (through a mechanism described elsewhere herein) into several million shares of the recapitalized company.[5]

Another component of the restructuring concept was the Macmillan Employee Stock Ownership Plan ("ESOP"), which would purchase a large block of Macmillan stock with $120 million of company-provided debt. It was also proposed to replace the existing Trustee, Citibank, with members of management.

These analyses and proposals were prepared in advance of the June 11, 1987 Macmillan Board meeting. At that meeting, the Board, at management's request, authorized several of the actions outlined in the internally prepared "restructuring charts." Specifically, the Board: (i) voted to grant 180,000 and 120,000 shares of restricted common stock to Evans and Reilly, precisely as blueprinted in the June 2, 1987 chart (*See* FN 5, *supra*),[6] (ii) approved a loan of $60 million which the ESOP would then borrow to fund its purchase of one million Macmillan shares, (iii) voted to replace Citibank as ESOP Trustee, substituting Evans, Reilly, Beverly Chell (Macmillan's General Counsel) and John Limpitlaw (a Macmillan Vice President). These persons thereby obtained voting control of all unallocated shares deposited in the ESOP.[7] In addition, the board granted Evans and

Reilly new five year contracts containing "golden parachute" severance provisions triggered by a change of control.

### 3. Later Steps and Other Antitakeover Measures

After the June 11, 1987 Board meeting, management continued to develop "antitakeover" measures. In late June, 1987, Macmillan engaged First Boston (HBJ's financial advisor for its restructuring) to furnish takeover defense advice.[8] First Boston recommended that Macmillan consider a leveraged restructuring, a concept that became the subject of a presentation at the July 7, 1987 Board meeting. At that meeting the Board also approved "golden parachute" severance contracts for twenty-one executives, and voted to increase the directors' annual compensation from $20,000 to $24,000 per year per director.

On August 3, 1987, the Macmillan Board held a special meeting where it adopted a shareholder rights plan, sometimes referred to as a "poison pill." The "flip-in" feature of that plan provided that if a person acquires 30% of Macmillan stock, the holders of the rights other than the 30% holder would be entitled to exchange their rights for Macmillan common stock at half price. The effect would be to severely dilute the investment of the 30% acquiror,

and (2) to increase management's and friendly parties equity stake (currently 4.9% through issued common and options) and control the company." (Lyons Exh. 16)

5. A June 2, 1987 chart depicts a scenario in which Evans, Reilly and other "key insiders" would be granted 400,000 shares of pre-recapitalization restricted Macmillan common stock. Evans and Reilly would receive 180,000 shares and 120,000 shares, respectively, with the balance (100,000 shares) going to "other key insiders." (Reilly Exh. 10).

6. The stock was restricted, in that full ownership rights would vest only over a five year period. The recipients did, however, have the right to vote the shares and to receive dividends during the five year period.

7. The defendants do not specifically explain how the restructuring concepts that were developed before June 11, 1987, and the actions taken by the Macmillan Board on June 11, 1987,

happened so exquisitely to coincide. Instead, the defendants deny in conclusory fashion that any relationship existed between the restructuring and the Board's June 11, 1987 actions. Defendants assert that the Board's decisions to issue restricted stock to Evans and Reilly and to approve the ESOP related transactions were made independent of any discussion about the restructuring. But the connection between the restructuring concepts outlined in the pre-June 11 charts and the actions taken by the Board on June 11, 1987 is manifest in the record. If the directors were unaware of the implications of their actions for the restructuring, it can only be because management failed appropriately to disclose those implications.

8. In February, 1988, several First Boston bankers assigned to the Macmillan account decided to form their own firm, Wasserstein, Perella & Co., Inc. ("Wasserstein Perella") That firm was also engaged to advise Macmillan, in conjunction with First Boston, as financial advisor for the restructuring at issue.

and, thus, to deter all stock acquisitions above the 30% "trigger" level. The Company's outside counsel advised the Board that the rights plan was intended to protect against abusive takeover tactics, such as "low ball" bids, market accumulation programs, partial and two-tiered tender offers. The rights plan would give the Board a powerful negotiating tool that would enable it to develop superior alternatives designed to maximize shareholder values.[9]

In August, 1987, one key restructuring concept was changed. To that point, management had focused on a one-company recapitalization. Further consideration led management and First Boston to conclude that it would be preferable to break up Macmillan into two separate parts: its publishing business and its information business, which would be "spun-off" in a separate entity. Defendants assert that a two-company structure would allow shareholders to receive a greater dividend than in a single company transaction, and would lead to a higher stock value for each of the separate entities. Plaintiffs suggest less charitable motives, namely that a shift to the two-company recapitalization would make a hostile takeover more difficult, since management could own a greater percentage of one of the two separate entities than would be the case in a single company recapitalization.[10]

The two-company concept generated two further steps. On August 18, 1987, MAC Information Corp. ("Information") was in-

corporated as a New York corporation to serve as the entity that would own Macmillan's information business.[11] Next, management determined, on the advice of counsel, that it could not proceed until it received an IRS ruling approving the two company recapitalization. Accordingly, on September 10, 1987, Macmillan's counsel submitted a request to the IRS for a tax ruling on a two-company restructuring which differed from the transactions previously proposed by management. Counsel represented that Information had two classes of common stock: Class A, entitled to ten votes per share, and constituting voting control of the company; and Class B, having one vote per share. All of the Class A shares would be owned by the management group and deposited into a voting trust with Evans as sole trustee. Moreover, Macmillan would issue to Information, a "blocking" preferred stock of Macmillan Publishing (the former Macmillan). Thus, Information (which would be controlled by management) would own 20% of Macmillan Publishing's voting power.[12]

The restructuring as proposed to the IRS was presented to the Macmillan Board at its September 22, 1987 meeting. The Board was told that a "two-company model would be more difficult for a raider to counter," and the above-described features of the restructuring (including management's voting control of, and substantial equity in, Information) were explained.

---

**9.** The ESOP, now controlled by Evans, Reilly, Chell, and Limpitlaw, was specifically exempted from the rights plan.

**10.** The percentage of stock that management could own after the recapitalization is inversely related to the value of the so-called "stub shares," i.e., the Macmillan shares that would survive the recapitalization. A chart dated June 15, 1987 demonstrates that in a one-company transaction, if the stub shares were valued at $5 per share, Evans, Reilly and "other key insiders" would own 35.2% of Macmillan. However, with each stub share valued at $14 per share, management's ownership percentage would decline to 16%. (Reilly Exh. 20). Plaintiffs contend that in a two-company recapitalization the allocation of values could be easily manipulated to decrease the imputed value of a "stub" share in one entity, thereby increasing management's ownership percentage of that entity.

**11.** In his letter to the IRS, Macmillan's counsel explained that a key information subsidiary, Standard Rule and Data Services (SRDS) was merged into Information "to reincorporate SRDS in New York so as to permit it to take advantage of the more favorable corporate laws of New York, such as ... the more advantageous merger and anti-takeover statutes ..." (Reilly Exh. 34). During these preliminary injunction proceedings the defendants announced for the first time that they intended to reincorporate Information in Delaware.

**12.** The restructuring as ultimately approved by Macmillan's Board in May, 1988, did not involve two classes of Information stock with disparate voting rights, the issuance of a "blocking" preferred stock in Macmillan to Information, or a voting trust.

There is no evidence that any director objected to that restructuring concept. At that meeting the Board also granted to management, options to purchase 202,500 shares of Macmillan at an exercise price of $74.25 per share.[13]

## B. The Emergence of The Bass Group

On October 21, 1987, the Bass Group, together with certain affiliates, filed a Schedule 13D with the SEC, disclosing their beneficial ownership of 1,986,180 shares (approximately 7.5%) of Macmillan common stock.[14] The Bass Group is a Texas corporation with its principal place of business in Fort Worth, Texas. It is controlled by Robert M. Bass, who individually controls various partnerships and enterprises formed to invest in publicly held companies. The Bass Group presently owns 9.2% of Macmillan common stock.

Management responded by calling a special meeting of the Macmillan Board on October 29, 1987. At that meeting the Bass Group's prior activities and their Schedule 13D were discussed. Bass was portrayed to the Board as a "greenmailer" whose *modus operandi* was to "creep" to a control position in publicly held companies. Cited as examples were transactions involving Texaco, Alexander's, Taft Broadcasting, Bell & Howell and Heritage Communications. The Board was told that the Bass Group had victimized those firms by either acquiring control of them, or accepting cash not paid to all shareholders, or acquiring target assets at below market value, or by selling its stock at a premium above market. Based on that presentation, the Board determined that the Bass

Group's history and the volatile market situation constituted a threat to Macmillan and its shareholders. It then voted to reduce the rights plan "flip in" trigger from 30% to 15%.

The Macmillan Board acted on the basis of its perception of the Bass Group. The Board's education on that subject was provided by management. But the record indicates that management's effort to portray the Bass Group as predatory "greenmailers" was less than accurate. Officials of Alexander's, Taft, Bell & Howell, and Heritage have submitted affidavits attesting that the management of those firms had requested Bass (or affiliates) to join their respective boards of directors and/or join in investments with them. That uncontroverted testimony undercuts the contention that these companies' shareholders had been victimized.[15] There is, moreover, no evidence that Macmillan management made any effort to accurately inform the Board of these facts. On the present record, I must conclude (preliminarily) that management's pejorative characterizations of the Bass Group, even if honestly believed, served more to propagandize the Board than to enlighten it.

On December 1, 1987, the Bass Group amended their Schedule 13D to reflect additional purchases of Macmillan stock. On December 10, 1987, Macmillan's counsel again wrote the IRS, describing the "compelling circumstances" necessitating Macmillan's request for expedited consideration:

> ... [O]n October 21, 1987 and, more recently, on December 1, 1987, an investor group led by Robert M. Bass made suc-

---

13. Because the October 19, 1987 "market crash" rendered those options of little value, they were subsequently cancelled and new options were issued in October, 1987.

14. Before forming the Bass Group, Robert M. Bass was a 25% owner and Vice President of Bass Brothers Enterprises, Inc., a separate entity that is managed by his brother, Sid Bass.

15. The affidavits show that Bass sold a 21% block of Alexander's common stock to a third party for a price that reflected a control premium. The buyer was a well known developer who brought a valuable development opportuni-

ty to Alexander's. In Taft, Bass's all cash offer to purchase the company was approved by Taft's directors and stockholders. In Heritage, the Bass holdings were held for investment by an independent trustee. Bell & Howell was sold in an open auction, in which management ultimately invited Bass to join in an all cash offer for Bell & Howell that was recommended by its directors and approved by its stockholders. (*See also* Bonderman Deposition at 169). Finally, the Texaco transaction was with Bass Brothers Enterprises, Inc., not Robert M. Bass Group, Inc., and had occurred before the Bass Group was formed and began to operate independently of Bass Brothers Enterprises, Inc.

cessive SEC Schedule 13D filings with respect to Macmillan, Inc. These filings, as well as current market conditions, increase the likelihood that a takeover attempt may be imminent and create an urgent need for the taxpayers to receive the rulings requested in our September 10, 1987 letter as soon as possible. (Lyons Exh. 7).

While awaiting the tax ruling, management continued to work on the proposed restructuring. The Board's Executive Committee met on February 12, 1988 to discuss the restructuring. Two charts had been prepared. The first chart, dated February 8, outlined a transaction wherein management would own 50.6% of Information's shares. (Reilly Exh. 55). The second chart, dated February 10, increased management's (Evans, Reilly and Chell's) share in essentially the same transaction, to 60%. (Reilly Exh. 56). The Executive Committee next met on February 23, 1988 and considered charts setting management's share of Information at 55%. All restructuring proposals clearly contemplated that management would own an absolute majority of Information's stock.

On March 22, 1988, the Macmillan Board held its last regular meeting before the 1988 annual stockholders' meeting. There the Board: (1) granted an additional 130,-000 shares of restricted stock to Evans, Reilly, Chell, and Charles McCurdy (a Macmillan Vice President), (2) determined to seek shareholder approval of the 1988 Stock Option and Incentive Plan, as well as authority to issue a "blank check" preferred stock [16] having potentially disparate voting rights, (3) increased the directors' compensation from $24,000 to $30,000 per year, and (4) instituted a Non–Employee Director Retirement Plan.[17]

### C. The Lazard Involvement, The Initial Bass Offer, and The Formation of The Special Committee

Sometime in February or March, management decided to form a Special Committee of the Board to evaluate the restructuring in which management would have a financial interest. That Special Committee was not, in fact, created until the May 18, 1988 Board meeting. Nonetheless, in April, 1988 Evans and other members of management interviewed, and for four weeks thereafter maintained intensive contact with, the investment banking firm that was to become the Special Committee's financial advisor.

During the first week of April, Wasserstein Perella, one of Macmillan's financial advisors, contacted Lazard Freres & Co. ("Lazard"), a prominent investment banking firm, to explore Lazard's availability to advise the to-be-formed Special Committee. On April 14, Lazard representatives met with Evans alone, and afterwards with Evans, Chell, and McCurdy. Five days later, Lazard representatives met with Evans, Reilly, Chell, McCurdy and another Macmillan executive, Samuel Bell. During this period Lazard was briefed in detail on the restructuring. Evans personally decided which restructuring plan to present to Lazard,—the plan under which the management group [18] would own 55% of Information. Thereafter, during the rest of April and into May, Lazard met regularly with Macmillan's management to exchange data and discuss the value of Macmillan. In total, Lazard professionals worked with management on the proposed restructuring for over 500 hours before their "client," the Special Committee, formally came into ex-

---

16. A colloquialism used to describe stock whose powers, designations, preferences and other rights are not described in the certificate of incorporation, but which, under 8 *Del.C.* § 151(g), may be fixed by the Board of Directors.

17. Under the Director Retirement Plan, all directors over 60 who have served on the Board for 5 years are entitled to lifetime benefits equal to the directors' fees being paid to the director at the time of his "termination." Of the eleven

non-management directors, seven would immediately qualify for benefits under this plan. Of the five members of the Special Committee formed to consider the restructuring, three would automatically qualify for those benefits.

18. Evans, Reilly, Chell, and McCurdy are the Macmillan executives that in the restructuring at issue will receive restricted stock representing, in the aggregate, 39% of Information. Those four individuals are referred to in this Opinion as the "management group."

istence and retained them.[19]

On May 17, 1988, in a letter delivered to Mr. Evans, the Bass Group made, and sought to discuss, an offer to acquire all of Macmillan's common stock for $64 per share cash. The letter, signed by Robert Bass, stated that the offer was intended to be consensual and was conditioned, *inter alia,* upon Board approval and obtaining appropriate financing. The Bass letter invited Evans and his management team to participate in the acquisition. Noting that the Bass Group had relied solely upon public documentation in making its offer, Mr. Bass indicated that after discussions with Evans, that offer might be increased. The Bass group letter was also made public in an amendment to the Bass group's Schedule 13D, which was simultaneously filed with the SEC.

On the following day, May 18, Macmillan held its annual stockholders' meeting, at which the shareholders approved the 1988 Stock Option Plan and the "blank check" preferred stock that the Board had recommended.

A Board meeting immediately followed. There, Evans reported the Bass Group proposal, but the Board decided to defer discussion of it until a further study could be made. Evans then outlined the proposed restructuring to the Board, explaining that it would result in the management group having control of Information.

Next, the Special Committee consisting of five non-management directors was formally created.[20] That Committee was charged with responsibility for "considering, investigating, evaluating and reporting to the full Board ... as to antitakeover

matters and economic alternatives, including the possible recapitalization." However, the Committee was not given express responsibility for negotiating the terms of the restructuring.

Finally, at that meeting, the directors (i) amended certain of the "golden parachute" severance agreements to redefine a "change of control" to include Board and/or shareholder-approved transactions resulting in any shareholder owning 20% or more of the company's voting stock,[21] (ii) amended its Retirement Plan to include benefits for spouses of Board members, and (iii) approved a $125 million mortgage on Macmillan's New York City building, the proceeds of which were used to finance the restructuring approved by the Board twelve days later.

### D. The Restructuring Developed As A Response To The Bass Group Offer

Although it was formed on May 18, 1988, the Special Committee engaged in no activity until its first meeting, held on May 24, 1988. Prior to that meeting, Evans and Reilly met with representatives of Lazard and Wasserstein Perella to discuss the main agenda items: presentation of management's restructuring plan, and the selection by the Committee of Lazard as its financial advisor and Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), a prominent New York City law firm, as its legal counsel.

The May 24, 1988 Special Committee meeting—which Evans, Reilly, Chell, and McCurdy attended—lasted about two hours. After it was ascertained that Lazard and Wachtell Lipton had no conflicts,[22]

---

**19.** On May 18, the day after the Bass Group offer, a Lazard partner working on the restructuring wrote a letter to Mr. Evans ("Dear Ned"), stating that "all of us at Lazard are keenly interested in working with you in any way that we can in connection with ... [the Bass Group offer]." (Golub Exh. 6).

**20.** The Special Committee members were Lewis A. Lapham, Chairman, James H. Knowles, Jr., Dorsey A. Gardner, Abraham L. Gitlow and Eric M. Hart. Mr. Hart, who was out of the country, never attended any meetings of the Special Committee.

**21.** The Board also approved a $65.8 million standby letter of credit to pre-fund these and other benefits in the event of a change of control.

**22.** The record indicates that the members of the Special Committee had not been told of Lazard's extensive work with management on the restructuring during the preceding four weeks. Mr. Knowles testified that he believed Lazard's prior involvement was limited to a preliminary exploration of Lazard's availability and potential conflicts. (Knowles Dep. at 52). Mr. Neff testified that such activities, if known, might

both firms were formally retained by the Special Committee.

The Special Committee was next briefed on the proposed restructuring of Macmillan into two separate companies, (the publishing and information segments). The Committee was told that senior management would collectively own more than 50% of the information company's. outstanding shares after the restructuring, which would convert management's existing equity-based compensation into stock in the to-be-spun-off information subsidiary. That restructuring was essentially identical to the transaction that which the Board ultimately approved on May 30, except that management's stock ownership in Information was reduced to approximately 39%.

Finally the Special Committee directed Lazard to study and evaluate the proposed restructuring and the Bass Group proposal. Mr. Evans also advised the Committee that Mr. McCurdy would be meeting with a representative of the Bass Group that same day.

The meeting between McCurdy and John Scully, the Bass Group representative, took place in Chicago on May 24. The record demonstrates that Evans so had limited McCurdy's authority as to make it a foregone conclusion that the meeting would yield no meaningful result. McCurdy had been instructed not to negotiate any aspect of the Bass Group May 17 offer or to discuss any of its terms, including a higher price. Accordingly, at their meeting, McCurdy told Scully that he was not authorized to discuss the Bass Group offer. He also advised Scully that Evans wanted the Bass Group to go away. McCurdy did raise questions about the Bass Group's in-volvement in earlier acquisitions. Mr. Scully explained the circumstances surrounding those investments, and he offered to make Bass Group officials available to provide further information to satisfy management's concerns. That offer was never acted upon, and Macmillan and Bass Group representatives never met again until after the restructuring had been formally approved and announced.

On May 27, the Board met to discuss the status of the restructuring. Mr. McCurdy reported on his meeting with Mr. Scully. At least one director developed the misimpression from McCurdy's report that McCurdy had tried unsuccessfully to get Scully to amplify or clarify the terms of the Bass offer. (Gitlow Dep. at 119–122). In any event, no director urged any further contact with the Bass Group.

The following day, May 28, the Special Committee met to hear Lazard's oral presentation,[23] which was supported by a booklet of written materials analyzing the proposed restructuring and the $64 Bass proposal.

The Lazard advisor explained that the restructuring would result in management owning 39% of the equity of Information—a reduction from the 55% level previously contemplated. The percentage reduction was suggested by the Special Committee's advisors, so that the restructuring would not be regarded as a transfer of corporate control from the public shareholders to management. The 39% ownership level was based upon certain valuations by Lazard of the (*pro forma*) equity of Information and Publishing.[24] Lazard valued the recapitalization at $64.73 per share, based upon an equity value of $100

have raised questions about Lazard's independence. (Neff Dep. at 111–112). Mr. Gitlow testified that he did not learn of Lazard's prior involvement until May 28, 1988, but added that such information did not cause him to question Lazard's independence. (Gitlow Dep. at 166–168). Evans, however, testified that he had informed Lapham of a "prior meeting" with Lazard "to see if they were clear of conflicts." (Evans Dep. at 104–105).

23. Although the discussion included the value to be placed on the Macmillan and Information

stock shares—valuations that would determine management's ownership percentage in Information—Evans, Reilly, Chell, and McCurdy also attended the meeting, and Chell acted as secretary.

24. "Publishing" is the Macmillan entity (the "stub" Macmillan) that will own and operate the publishing business after the restructuring. "Information" is the "stub" entity that will own and operate the information business.

million ($4.40 per share) for Information and $200 million ($5.20 per share) for Publishing. Lazard also stated that it valued Macmillan on a pre-tax sale basis at $72.57 to $80 per share. Lazard advised the Board that it would be able to render its written opinion rejecting the Bass Group $64 proposal as inadequate, and approving the restructuring (including the management group's 39% ownership of Information) as fair, at the next meeting.

The antitakeover efforts that had begun one year before culminated at the joint meeting of the Macmillan Board and the Special Committee on May 30, 1988. At that meeting, Lazard representatives analyzed the Bass Group proposal and opined that it was inadequate from a financial point of view. Lazard then opined that the restructuring, (now valued at $64.15 per share) was fair. Wasserstein Perella valued the restructuring at between $63 and $68 per share; and opined that the proposed restructuring was fair, but that the $64 Bass Group proposal was unfair and inferior to the restructuring.

After the full Board considered these reports, the meeting was recessed to allow the Special Committee to meet separately with its advisors. Thereafter, the Special Committee recommended, and the full Board voted, to adopt the restructuring and to reject the Bass Group proposal. In recommending the restructuring, the Special Committee relied upon the advice of Lazard. It did not negotiate with management over any aspect of the transaction, including management's ownership levels in the restructured companies.

On the following day, May 31, Macmillan announced the restructuring in a press release, disclosing that the transaction would be consummated only ten days later, on June 9 and 10. (Stock exchange rules require at least ten days to consumate the transaction). The restructuring was not made subject to shareholder approval, and

that May 31 press release was the first communication to the shareholders that their company would be radically altered.

To understand both the response to the May 31 announcement and the legal challenges to the restructuring, various elements of the restructuring must briefly be described.

### E. The Elements of The Final Version Of The Restructuring

The restructuring is, conceptually speaking, two separate transactions. The first involves Macmillan's public stockholders; the second involves the management group (*i.e.*, Evans, Reilly, McCurdy and Chell).

For each of their Macmillan shares, the public shareholders will receive a dividend consisting of: (i) $52.35 cash, (ii) a $4.50 debenture, (iii) a "stub share" of Macmillan ("Publishing") valued at $5.10, and (iv) a one-half share of Information valued at $2.20. The cash component of the dividend will be financed by a $1.7 billion borrowing by Information and Publishing, secured by their assets. The Information stock component will result from the spin-off of all of Macmillan's Information shares to Macmillan's public stockholders. Lazard placed a $64.15 per share total value on this restructuring dividend.

The management group (and the ESOP) will be treated quite differently from the public stockholders. The management group would forego the cash and debenture components of the dividend and will exchange most of their restricted stock and unexercised options in Macmillan for restricted Information shares [25] representing 39.2% of the equity of Information. The management group and the ESOP will also own 3.2% and 26%, respectively, of the shares of Publishing. The ESOP will purchase its shares for $5.10 per share, the trading price for Publishing determined by Lazard.[26]

---

**25.** The Information stock to be received by the management group is restricted in that it would not be saleable, pledgeable, or transferable for two years, and would not fully vest for five years. However, the holders of the restricted

shares may vote the restricted shares and receive the dividends paid on them.

**26.** The ESOP would also own 4% of Information. It will be recalled that the ESOP Trustees were members of management. On May 30, the

The mechanism whereby management's present 4.5% equity interest in Macmillan would be enlarged into a 39% interest in Information is complex. In oversimplified terms, the management group's "equity based compensation" will be multiplied by a conversion ratio of 14.58. "Equity based compensation" includes (i) restricted shares of Macmillan that the management group received in June, 1987 and March, 1988 and (ii) unexercised but exercisable options that the management group received between 1982 and 1986. Each of the management group's restricted Macmillan shares would thus become 14.58 shares of restricted Information stock.[27] The stock options would be exchanged for options to purchase restricted Information shares, multiplied by the 14.58 conversion factor. Those Information options would then be exercised immediately at the exercise price of $0.[28]

The management group's combined 39% equity interest in Information is claimed by the defendants' investment bankers to be economically equivalent in value to management's present combined holdings in Macmillan (4.5%). The restricted stock and exercisable options, taking into account the (to-be-foregone) dividend, were valued at approximately $39 million. The (pro forma) equity of Information was valued at approximately $100 million. Accordingly, it was concluded, the management group would be entitled to receive 39% of Information's equity worth, in this valuation, $39 million.

F. The Second Bass Offer And Responses Thereto

After the restructuring was announced, Bass Group representatives met with Ev-

ans, Reilly, and others on June 3 and 4, to discuss Bass Group proposals that would involve, *inter alia*, all shareholders being treated equally. Other proposals were also discussed, but no accommodation was reached.

Late on June 4, the Bass Group made a second offer for Macmillan, with two alternative proposals: (1) an offer to purchase any and all shares of Macmillan for $73 per share cash, and (2) a restructuring/recapitalization materially indistinguishable from the one approved by the Board on May 31, except that (a) Macmillan's management would not receive Information stock (they would receive the restructuring dividend, like all stockholders), (b) the Bass Group would pay cash for the Information stock that would otherwise go to management, and (c) Macmillan shareholders would receive a cash dividend of $58 per share— $5.65 more than they would receive under the management-proposed restructuring.

The revised Bass offer was forwarded to Lazard, which on June 6 concluded that it could furnish an "adequacy" opinion that would enable the Special Committee to reject the $73 per share cash portion of the Bass offer. That same day, the Bass Group filed this action to enjoin the restructuring.

On June 7, 1988, a joint meeting of the Special Committee and the full Board was held. At that meeting a Lazard representative orally advised the Board of Lazard's conclusion that the Bass Group $73 per share cash offer (as distinguished from their alternative restructuring offer) was inadequate, because if the company was sold, it should be able to obtain more than $73 per share, given Lazard's previous

---

Board decided to replace them with an independent ESOP Trustee.

**27.** The 14.58 conversion ratio was derived by dividing the $64.15 per share value of Macmillan at the time of the restructuring (determined by Lazard) by the $4.40 value (again, as determined by Lazard) of one share of Information. That ratio represents Lazard's view that at the time of the restructuring one share of (pre-restructuring) Macmillan will be worth 14.58 shares of Information.

**28.** The management group will also receive cash and other benefits apart from their collective 39% stock interest in Information. These include: $2.7 million from the acceleration of presently non-exercisable stock options, $2.4 million from "cashing out" the Long Term Performance Plan, 62,000 restricted Macmillan shares to be exchanged for Publishing stock valued at approximately $4 million, and the retention of the right to "golden parachute" severance agreements. The tax liability resulting from the acceleration of the options is also to be paid by Macmillan.

opinion that Macmillan's pre-tax "breakup" value was between $72 and $80 per share. Wasserstein Perella expressed a similar viewpoint, based upon their valuation of between $66 and $80 per share. The Lazard and Wasserstein Perella representatives both noted supposed ambiguities in the alternative Bass restructuring proposal. A Wasserstein Perella representative expressed his view that the Bass alternative restructuring was essentially a sale of control of the company, whereas the management restructuring (which was practically identical, except that the public shareholders would receive $5.65 per share less) was not. None of the defendants' financial advisors opined, however, that the Bass Group alternative restructuring was financially inadequate.

Ultimately, the Special Committee and the Board determined to reject both of the Bass Group June 4 proposals. (That decision was reaffirmed by a telephone meeting of directors reconvened on June 8, 1988). On the same day, Lazard, Wasserstein Perella, and First Boston each delivered formal written opinions that the Bass Group's $73 "any and all" cash offer was inadequate. These firms did not however, submit any formal opinion that the Bass Group alternative restructuring proposal is unfair.[29]

## II. APPLICABLE LEGAL STANDARDS AND THE PLAINTIFFS' CONTENTIONS

■ To obtain a preliminary injunction, a plaintiff must establish a reasonable probability of success on the merits, irreparable harm that will occur absent the injunction, and must also demonstrate that the irreparable harm to the plaintiff if injunctive relief is denied outweighs the harm the defendants will suffer if relief is granted. *Ivanhoe Partners v. Newmont Mining*

*Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 179 (1986) ("*Revlon*").

Plaintiffs contend that the restructuring must be enjoined on three independent grounds. First, they argue that the adoption of the restructuring as a defensive measure was unreasonable, unresponsive, and disproportionate in relation to any reasonably perceived threat to corporate policy and effectiveness posed by the Bass Group. As such, the restructuring is claimed to violate the Macmillan directors' fiduciary duties under *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985) ("*Unocal*"). Second, plaintiffs argue that the restructuring constitutes a violation of the defendants' fiduciary duties under *Revlon*, because control of the company is being transferred to management without the directors having obtained the highest available value for shareholders. Third, plaintiffs claim that the restructuring involves a violation of the defendants' duty of candor, because they obtained shareholder approval of the 1988 Stock Option Plan without disclosing that options issued under that Plan would be used to implement a restructuring of the company approved only two weeks later. The defendants, not surprisingly, vigorously dispute all these contentions.

For the reasons now discussed, the Court concludes that the plaintiffs have shown a reasonable probability that they will succeed at trial on their first claim. Plaintiffs have demonstrated preliminarily that the restructuring represents an unreasonable and disproportionate antitakeover response to the Bass Group proposals, and thus constitutes a violation of the defendants' fiduciary duties under *Unocal* entitling plain-

**29.** During the three week period between the filing of this action and the hearing on the preliminary injunction, the defendants modified their restructuring proposal in certain respects. On June 7, Evans, Reilly, Chell and McCurdy submitted identical written undertakings, representing that for three years they will vote Information shares for a slate of nominees, a majority of which are independent directors. On June

24, those same persons wrote letters to Macmillan formally undertaking "not to purchase any additional shares of [Information] for a period of four years without the prior approval of the Board of Directors of [Information]." And in their answering brief filed on June 27, the defendants announced that subject to IRS approval, they will reincorporate Information (presently a New York corporation) in Delaware.

tiffs to an injunction.[30]

## III. PROBABLE SUCCESS ON THE MERITS

■ Where, as here, a corporate transaction is sought to be enjoined as a breach of fiduciary duty, the standard governing the propriety of that transaction will depend upon the context or setting in which it arises. If the transaction is approved by disinterested directors acting in good faith and pursuant to an appropriate deliberative process, the reviewing court will evaluate the transaction under the business judgment rule. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Ch., 533 A.2d 585, 606, *aff'd.,* Del.Supr., 535 A.2d 1334, 1341 (1987) (*"Newmont Mining"*); *AC Acquisitions v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 111 (1986) (*"Anderson, Clayton"*). Under that standard, the transaction is presumed to be valid, and the directors' decision will not be disturbed, so long as it can be attributed to any rational business purpose. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971); *Unocal,* 493 A.2d at 954.

■ A far more strict standard is applied, however, if the challenged transaction arises in a context of self-dealing; that is, if the corporate fiduciaries have stood on both sides of the transaction and approved its terms. In that setting, because the fiduciaries charged with protecting the interest of the public shareholders have a conflicting self interest, those fiduciaries must establish the transaction's "entire fairness" to the satisfaction of the reviewing court. *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701 (1983); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107 (1952); *Anderson, Clayton,* 519 A.2d at 111.

■ A third, intermediate, standard applies to this case. Where, as here, the transaction at issue develops in the context of a pending takeover bid, even a disinterested board of directors "may be acting primarily in its own interests." (*Unocal,* 493 A.2d at 954). Accordingly, where the challenged transaction is adopted as an antitakeover defensive measure, the directors must discharge a dual burden of proof to qualify for the protections of the business judgment rule. First, the directors must establish that they had reasonable grounds for believing that there was a danger to corporate policy and effectiveness. That burden may be satisfied by a showing of good faith and reasonable investigation. Second, the directors must demonstrate that the measures they adopted in response to the threat were reasonable in relation to the threat posed. *Unocal,* 493 A.2d at 955; *Revlon,* 506 A.2d at 180.

In this case, the propriety of the restructuring will be evaluated under *Unocal.*[31]

### A. Whether The Bass Group Offers Constituted A Threat

■ Under *Unocal* the Court must first determine whether the Bass Group offers posed (and continue to pose) a reasonably perceived threat to corporate policy and effectiveness.

Takeover bids found to be a threat have typically involved a coercively structured proposal, such as a two tiered, hostile tender offer. *See e.g., Unocal* and *Newmont Mining.* The May 17 Bass offer, however, was to purchase any and all of Macmillan's stock for $64 per share cash—a 26% ($13.38 per share) premium above the market price. The offer was not

---

**30.** That conclusion makes it unnecessary to (and the Court therefore does not) address the plaintiffs' claim under *Revlon* or their disclosure violation claim.

**31.** No party seriously disputes that the restructuring at issue was a reaction to the Bass offers. In a footnote in their Answering Brief (p. 61, FN) the defendants state that they "do not concede that the *Unocal* standard applies to the restructuring." However, the defendants have made no reasoned argument to support that nonconcession, either in their preliminary injunction papers or at oral argument. The arguments that the defendants do advance are made under *Unocal.* Moreover, the record indisputably shows, and the defendants do not deny, that the restructuring was intended as a response to the Bass Group offers.

hostile. It was consensual, made subject to the approval of the Board of Directors, and the letter proposing the offer specifically invited negotiations over price. After the restructuring was announced, the Bass Group increased its offer to $73 per share. As noted earlier, the Bass Group also proposed an alternative transaction essentially identical to restructuring, except that the Bass Group would acquire the 39% stock interest in Information, and the public shareholders would receive an additional $5.65 per share in cash. All Bass Group offers proposed the same price to all stockholders, were not "front-end loaded," and their financing did not depend upon a "break-up" of the Company.

The defendants argue that the Bass offers were a threat, because (i) they put the company "into play," as evidenced by approximately one-third of Macmillan's publicly traded shares changing hands within days after the initial Bass offer was disclosed; (ii) the Bass Group had a reputation as "greenmailers" whose *modus operandi*, as evidenced by previous acquisitions, was detrimental to public shareholder interests, and (iii) the initial ($64) offer was unfair to shareholders. For the reasons that follow, these arguments lack probable merit.

The defendants' first contention resembles more a slogan than a reasoned legal argument. Defendants claim that the announcement of the Bass proposal put the Macmillan "into play" by causing significant open market trading. That fact alone does not demonstrate actionable harm. Presumably the selling shareholders wished to take immediate advantage of the market price increase resulting from disclosure of the Bass proposal. No claim or showing is made that any selling or non-selling shareholder was coerced or otherwise harmed in the process. *Cf., Newmont Mining*, 533 A.2d at 604–606, *aff'd.*, 535 A.2d at 1343–44.

The defendants' claimed perception of the Bass Group as greenmailers who engaged in predatory acquisition practices also lacks record support. The "threat" perceived by the directors reflected management's inaccurate characterization of the Bass Group.[32] (*See* page 1232, *supra*, of this Opinion). Neither management nor the Board engaged in a reasonable investigation of the Bass Group, as required by *Unocal. See Unocal*, 493 A.2d at 954–955; *Revlon*, 506 A.2d at 180. The Special Committee made no effort, directly or through its advisers, to investigate the Bass offer. Management's investigation consisted of sending Mr. McCurdy to have a single cursory meeting with Mr. Scully, a Bass representative. That encounter was little more than a charade, because Mr. McCurdy was instructed not to (and therefore did not) negotiate or substantively discuss the terms of the Bass offer. Scully conveyed information to McCurdy about the Bass Group and its past practices, but there is no evidence that that information was communicated to the Board. Scully also offered to make available other Bass personnel to respond to management's concerns on that score, but no one on Macmillan's side took up that offer. That is not the kind of reasonable investigation required to discharge the Board's fiduciary duties under *Unocal*.

Third, the defendants argue that the $64 Bass offer was reasonably perceived as a threat, because it was substantially below the values that their financial advisors, Lazard and Wasserstein Perella, had opined was fair. If that price were firm, the argument might have a plausible factual basis. *Cf. BNS, Inc. v. Koppers Co.*, 683 F.Supp. 458, 475 (D.Del.1988). However, the $64 offer was only an opening bid, by its own terms subject to negotiation. Management here had no desire to negotiate. They chose to close their eyes and to treat the offer as firm and unalterable. The Board

---

**32.** The record indicates that at least some members of management believed that the Bass Group were responsible investors. (*See* Bonderman Dep. at 169). Indeed, in the fall of 1987, after the Bass Group had supposedly surfaced as a threat to Macmillan, Evans contacted Bass and told him that he was interested in participating with them as a co-investor in the Bell & Howell transaction (Evans Dep. at 129) and in other transactions as well. (Bonderman Dep. at 109; Bass Dep. at 135).

and the Special Committee followed in lock-step. Neither took reasonable measures to uncover the facts.

Defendants argue that the mere making of an offer did not create a duty on their part to sell the company. However, that proposition, while correct, does not excuse their conduct here. Where, as here, corporate directors decide to resist a takeover bid on the ground that it constitutes a threat, *Unocal* requires that their decision rest upon a reasonable investigation and be made in good faith. That decision cannot rest upon a studied avoidance of a reasonable investigation, in order to rely upon self-serving conclusions without basis in fact.

The defendants' unfair price argument also founders, because the Bass Group increased its offering price to $73 per share. That price is within the range of values defendants' own financial advisors opined was fair. Bass also proposed an alternative restructuring proposal that offers all shareholders $5.65 per share more in cash than the restructuring. No financial advisor for the defendants has opined that that alternative proposal is unfair. As discussed elsewhere, each of these revised Bass offers is clearly superior to the restructuring.

Finally, in determining whether and to what extent the Bass offers constituted a threat, the Board was required to consider the antitakeover devices already at its disposal. Macmillan's arsenal was formidable. Management had available the "poison pill" rights plan, which would effectively deter the Bass Group (or anyone else) from acquiring over 15% of Macmillan's stock.[33] Macmillan also had (i) a "fair price" provision in its charter, providing additional protection against front-end loaded offers, (ii) a by-law provision prohibiting

the calling of a special meeting without a 75% shareholder vote, (iii) a Board of Directors with staggered terms, (iv) "golden parachute" severance provisions for its executives, backed up by a $60 million letter of credit, and (v) authorization to issue "blank check" preferred stock with potentially disproportionate voting rights. Clearly the Macmillan Board was well equipped to respond to any threat posed by the Bass Group. Even if, *arguendo*, the Bass offers were hostile, coercive and/or unfair, the Board scarcely needed to fear any threat to corporate policy and effectiveness. *See Unocal*, 493 A.2d at 955.

The Court thus concludes that if the Bass offers posed a cognizable,[34] reasonably perceived threat, it was only in the minimal sense that the Bass Group's current proposal of $73 per share, although fair, is less than the highest price that the defendants' financial advisors believed might be obtained if the entire company were put up for sale.

B. The Reasonableness Of The Restructuring As A Defensive Response

The second inquiry under *Unocal* is whether the Macmillan directors' response to the Bass offer—the restructuring—is reasonable in relation to the threat posed. For the reasons now discussed, I conclude that it is not.

The circumstances of each individual case determine the reasonableness of an anti-takeover defense. That determination, of course, will depend upon the nature of the threat posed. Here, the threat was (to repeat) that the Bass $73 per share proposal, while fair, was not the highest price that might be available if the company were being sold. A reasonable response, then, would be to develop a more valuable eco-

---

**33.** In addition, the Bass Group could not conduct a "street sweep" or take other immediate action to acquire shares, because the Bass Group had not sought (and until June 6 did not seek) clearance under the Hart–Scott–Rodino Act.

**34.** That is, a threat other than to the incumbency of the Board or to the management group's expectation of garnering a 39% ownership inter-

est in Information on extremely favorable terms. Because the alternative restructuring proposal is identical to the management-originated restructuring—except that the Bass Group would purchase the 39% interest in Information and the public shareholder would receive $5.65 per share more cash—the alternative restructuring proposal cannot fairly be regarded as a cognizable threat under *Unocal*.

nomic alternative. That alternative might take several different forms. For example, if the directors concluded that the company should be sold, it would be reasonable to solicit higher bids from other bidders, as well as the original offeror. If the company was not be be sold, the directors might propose a noncoercive transaction that would offer shareholders higher value, whether immediate or long term, while also enabling them to retain their equity in the corporation.[35]

Thus, given the nature of the threat, a reasonable response would, at a minimum, offer stockholders higher value than the Bass Group offer or, at the very least, offer stockholders a choice between equivalent values in different forms. The management restructuring offers neither. Not only does it offer inferior value to the shareholders, it also forces them to accept it. No shareholder vote is afforded; no choice is given. The restructuring is crafted to take the form of a dividend, requiring only director approval. On that basis alone, as more fully discussed below, I find preliminarily that the restructuring is a coercive, and economically inferior, response to the Bass Group "threat." *Anderson, Clayton*, 519 A.2d at 113–114.

As previously explained, the Bass Group's alternative restructuring proposal is financially superior to the restructuring from the standpoint of Macmillan's public stockholders. Nonetheless, the Board rejected the alternative proposal, apparently in reliance on the advice of a Wasserstein Perella representative, who (according to the minutes of the June 7 Board meeting) stated:

> * * * the Bass restructuring appeared to be essentially a sale of the Company financed by the public. He said the directors could have sold control of the Company to any third party if they had wished to. Instead, they had designed the current incentivising [sic] structure to increase the equity of the leveraged entities. He said in his view selling equi-

ty to management was an entirely different proposition from selling equity to Bass. While there was a superficial similarity between the two restructuring proposals, from a shareholder's point of view Bass is an extraneous force, while management through its efforts is the generator of profit. The present structure preserves the upside of the enterprise for the shareholders.

There is no evidence that any member of the Board or the Special Committee questioned how a sale of 39% of Information would constitute a sale of the company if sold to the Bass Group, yet would not be if that same 39% interest is sold to the management group. The defendants have failed to explain that reasoning, and its logic continues to elude the Court.

The defendants claim that the Bass "any and all" offer for $73 per share is inferior, because it involves a transfer of control to Bass. They claim that the restructuring does not, because it enables the shareholders to retain control and, thus, the ability to realize a control premium in the future. That argument fails on two counts. First, even if the restructuring is assumed not to involve a transfer of control (thereby justifying a discounted value for Information because a control premium is absent), the defendants' own valuation of the restructuring is still less than $73. The defendants' financial advisors valued the restructuring at $64.15, which includes the value of the stub equity that shareholders will retain, thus taking into account whatever control premium might be realized in the future.

Second, the present record indicates that the restructuring, although not a sale of an absolute majority interest, does constitute a sale of effective control of Information that would warrant a control premium. Wasserstein Perella so recognized in its comparison of the management and alternative restructuring proposals. Documents internally generated by Macmillan

---

**35.** An example of such a transaction affording immediate value would be a company self-tender at a price above the pending offer. An example of a transaction offering higher long term value would be a recapitalization involving a cash dividend which, when combined with value of the (fairly valued) stub equity, is worth more than the pending bid.

reported that the management group would have effective control over Information even with less than 50% of its stock. (Reilly Exh. 69–75). That conclusion is consistent with decisions by the courts of this and other states.[36]

Finally, the conclusion that effective control will pass to management is consistent with the intent and historical evolution of the restructuring which, in every proposed permutation, had management owning over 50% of Information. That was the plan up until the last moment, when counsel advised the Special Committee that the issuance to management of an absolute majority of Information stock could be interpreted as a sale of the company. (Reilly Dep. at 279; Neff Dep. at 13–14). Such a sale would arguably trigger duties under *Revlon*, which requires that the directors selling the company realize the highest available value for shareholders.[37] By reducing management's equity percentage to below 50%, the risk of triggering *Revlon* duties would be reduced if not eliminated, yet the objective of giving management effective control would still be accomplished. The change, then, was one of form, not substance, a conclusion supported by charts prepared for the Board on May 27, 1988, which stated that management would obtain "voting control" over Information even with a block of less than 50%. (Reilly Exh. 71 and 74).

To summarize: the Court finds (preliminarily) that the restructuring involves a transfer of effective control that under normal market conditions would command a control premium. However, the "fairness" opinions upon which the defendants rely to defend the restructuring are expressly grounded on the assumption that control will not pass. Accordingly, the $64.15 restructuring is inferior to the $73 Bass offer on that basis as well.

The defendants respond that the restructuring is reasonable because: (i) it allows shareholders to realize immediate value while retaining their equity interest, with the prospect of receiving long term value; (ii) it creates a structure designed to result in a higher market value for each separate component, and (iii) it "incentivizes" [sic] management to efficiently manage the companies by "tying up" a large portion of management's net worth in the equity of these companies, thereby inducing them to increase their stock value.

But these rationales, even if accepted, do not justify forcing shareholders to accept an economically inferior transaction while, at the same time, precluding them from considering an economically superior one. The directors certainly were free to propose the restructuring to their shareholders. However, as fiduciaries they were not free to "cram down" that transaction in order to "protect" their shareholders from a noncoercive, economically superior one.[38] Under *Unocal* the directors were obligated to give the shareholders a choice. The

---

**36.** *See Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964) (holding that an approximately 20% block of stock should command a control premium), *Freedman v. Restaurant Associates Indus., Inc.,* Del.Ch., C.A. No. 9212, Allen, C. (October 16, 1987), at 3 [1987 WL 14323] (37% of the voting stock found to represent effective voting control), *Essex Universal Corp. v. Yates,* 305 F.2d 572, 579 (2d Cir.1962) (28.3% shareholder "almost certain to have share control as a practical matter").

**37.** *See Black & Decker Corp. v. American Standard, Inc.,* 682 F.Supp. 772 (D.Del.1988), where Judge Longobardi enjoined a defensive restructuring that would have caused a reduction in the public shareholders ownership from 92.6% to 45.5% and increased management's share from 4.8% to 23.9%. (The restructuring also included the transfer of 30.6% of the shares to an ESOP). The court found that the surrender of majority control by the public stockholders constituted, in those circumstances, a sale of control that was equivalent to a "sale of the company" under *Revlon.* That court noted that the Board "while at the same time mouthing cliches about a desire to remain independent, paint a picture of deliberate actions calculated to culminate in a sale of the corporation" (*Id.* at 780) and that "management is availing themselves of the takeover threat to increase their and the employees' ownership interest in the company." (*Id.* at 784).

**38.** Here, as in *Black & Decker, supra,* management was also able to use the "threat" posed by the Bass offers to "[avail] themselves of the takeover threat to increase their, and their employees' ownership interest in the company." 682 F.Supp. at 784.

restructuring, because it deprives them of that choice, is manifestly unreasonable.

In *Anderson, Clayton,* 519 A.2d at 113–116, a hostile bidder made an any-and-all offer at $56 per share, which was found to be a fair price. In response, the company initiated a partial self-tender at $60 per share, also a fair price. Nonetheless the Court enjoined the company self-tender, finding that it was economically coercive because its timing precluded shareholders from accepting the $56 offer. This Court stated:

> ... A defensive step that includes a coercive self-tender timed to effectively preclude a rational shareholder from accepting the any-and-all offer cannot, in my opinion, be deemed to be reasonable in relation to any minimal threat posed to stockholders by such offer.

519 A.2d at 114.

Here, the circumstances are even more compelling than in *Anderson, Clayton.* There, the defensive recapitalization and the outside bid were economically equivalent. Both were at a fair price, neither being inferior to the other. Moreover, the shareholders had been afforded the opportunity to vote on (and had approved) the company transaction. Nevertheless, the company recapitalization was found offensive under *Unocal* because it effectively deprived shareholders of the opportunity to choose between the competing alternatives. Here, in contrast, the defensive transaction is economically inferior to the outside bid and the shareholders have no choice but to accept it. On that basis alone, the restructuring is an unreasonable response under *Unocal.*

### C. Other Unreasonable Aspects Of The Restructuring

From a strictly legal standpoint, no further analysis under *Unocal* is required. However, the restructuring does have two other offending qualities that exacerbate its unreasonableness and which therefore merit comment. First, the restructuring will make Information "takeover proof," because it will tend to entrench the management group and virtually eliminate the public shareholders' opportunity to realize a "takeover premium" for their shares without obtaining management's consent. Second, the proposed 39% level of management's equity ownership is derived from valuation methods that are either incorrect or, at the very least, highly questionable. Although treatment of these issues is not essential to this Court's holding, they are briefly addressed so that judicial silence will not be misread as judicial approval of those matters. Time constraints, unfortunately, permit only a cursory treatment.

First, the Court has already found that management's proposed 39.2% equity interest constitutes effective control of Information. Thus, even if public shareholders may, theoretically, approve a takeover bid over management's determined opposition, that result is highly improbable as a practical, real-world matter. That finding is amply supported by the evidence of record, including the uncontroverted affidavits of Mr. Richard Nye, Chairman and Chief Executive Officer of Georgeson & Co., Inc., a well-established proxy solicitation firm. Mr. Nye testified that voting control must be determined in relation to the shares that could be expected to vote in a proxy contest. For companies having a large number of stockholders, 80% to 83% of all eligible shares typically vote in contested matters, and a certain percentage of individual shareholders will routinely support management. On that basis, Mr. Nye concludes that management's 39.2% block gives it undisputed control of close to 50% of the shares expected to vote, and effective control of over 50% of those shares.

Information's debt financing agreements, its certificate of incorporation and by laws, and management's "golden parachute" severance agreements also constitute formidable obstacles to a change of control. The debt financing agreements provide that a change of control will constitute an event of default, that could accelerate Information's obligation to pay over $680 million of debt. As noted earlier, the certificates of incorporation and by-laws of both Publishing and Information (i) provide

for a staggered Board having three classes of directors; (ii) prohibit the calling of a special meeting unless at the request of stockholders holding at least 75% of the stock; (iii) require a two thirds vote to amend the by-laws, and (iv) authorize the Board to issue "blank check" preferred stock. Finally, the "golden parachute" severance agreements provide that the accumulation of a 20% block is a change of control that would trigger $60 million in payments to management, unless the directors unanimously determine otherwise. Based on the foregoing agreements and provisions, the defendants' Information Statement at 15–16 disclosed that the restructuring:

> ... may deter a takeover of [Information] and thereby inhibit a change of control of [Information] in circumstances that could give [Information] stockholders the opportunity to sell their shares at a premium over the prevailing market prices ...[39]

The defendants contend that Information will not be "takeover proof." They argue, first, that the management group's 39% interest should not be treated as a monolithic block. But the record indisputably shows that these individuals have always acted in unison, and that Reilly, Chell, and McCurdy will have strong incentives to remain on good terms with Evans, who would be their immediate superior and Information's largest single stockholder.

Defendants next argue that the management group has signed "standstill agreements" where they agree to purchase no additional shares of Information for four years. The management group has also agreed that for a period of three years, they will vote their shares for a slate of directors that will include a majority of "independent directors." However, the

"standstill agreement" is loosely drafted. Its terms do not clearly prevent management from enlarging their stock interest in Information by other methods, e.g., the issuance of stock options to management or the acquisition of more stock by family members. On the other hand, the undertaking to elect independent directors has been carefully drafted, so that its terms would permit the management group to select directors that might not act independently of management, but would prevent the selection of directors who would be likely to act independently.[40]

The other offending quality of the restructuring is that the management group's proposed 39% equity interest appears excessive. The 39% ownership level is said to be derived from the Lazard valuation formula that fixes the "stub equity" value of Information. Under that formula the price of the stub value is inversely related to the management group's ownership level in Information. (The lower the stub value, the higher the management group's equity percentage). However, that "stub equity" valuation rests upon at least one assumption that is incorrect, and upon others that are highly questionable. As a result, the defendants have failed to demonstrate, at least at this stage, that that highly important aspect of the restructuring is reasonable to Macmillan or its public shareholders.

Many valuation issues have been raised. Because of time constraints, I limit myself to two of them.

First, defendants' financial advisors premised their valuations of the stub equity (and their conclusion that those valuations were fair) on the assumption that control had not passed and that the public shareholders would retain their ability to realize a control premium. Both assump-

---

**39.** A similar disclosure was made with respect to a potential change in control of Publishing.

**40.** "Independent director" is defined to exclude only officers or directors of Information, or persons who own 5% or more of Information stock, or persons affiliated with the 5% shareholder. That definition would enable the management group to nominate officers or other employees of Publishing or close personal friends of the management group who do not come within the definition. At the same time it would preclude management group support for any large (5% or more) stockholder who is not affiliated with management, even one who, because of the size of his investment, would have a significant stake in how the corporation is being managed.

tions have been found preliminarily to be incorrect. It follows that the management group's 39% equity interest represents a discount price, because management would receive effective control without paying a control premium to the "sellers," *i.e.*, the public shareholders. The result is a windfall to management at the expense of Macmillan's public stockholders.

Second, the defendants' valuation of Information's stub equity rests upon questionable assumptions about the post-restructuring trading values of Information and Publishing. Lazard arrived at the 39% ownership level by concluding that Information would trade at a price of $4.40 per share. That trading value was based on the assumption that public shareholders would not lose their ability to control when or whether to realize "private market value" (*i.e.*, acquisition value) from the sale of Information as a whole. The same assumption was made with regard to a transfer of control of Publishing. Lazard then projected that Information would trade at a "deep discount" from (*i.e.*, at only 31% to 44% of) its private (acquisition) value. However, Wasserstein Perella, the other financial advisor that furnished an opinion on the fairness of the restructuring,[41] projected that Publishing would trade at prices *in excess* of its acquisition value.

No satisfactory explanation is given for such inconsistent treatment of two companies supposedly equally situated from a control standpoint. If Publishing's acquisition value is not discounted to arrive at a trading value, logic suggests that Information's acquisition value should not be discounted either. On the other hand, if it is proper to discount the "private market" or acquisition value of Information (but not of Publishing), the only logical basis would seem to be that the value of Information shares is depressed because of the market's recognition that management has ef-

fective control of the company. That explanation, while inconsistent with the defendants' underlying valuation assumption, is entirely consistent with the Court's preliminary finding that management's 39% equity interest represents effective control.

For these additional reasons as well, the restructuring is an unreasonable response under *Unocal.*

## IV.  IRREPARABLE HARM AND BALANCING OF THE EQUITIES

■ Finally, I address the elements of irreparable harm and the balance of equities, both of which favor the plaintiffs. The record clearly establishes that if preliminary injunctive relief is not granted, the plaintiffs will be irreparably harmed in several ways.

First, Macmillan's capital structure will be permanently and irretrievably altered by its division into two companies. The stock of each company will be publicly traded; over time the shareholders of the separate companies will be different from the present shareholders of Macmillan. As plaintiffs point out, there would be no practical way to "put Humpty Dumpty back together again" if the restructuring goes forward but is ultimately found to be unlawful.

Second, the management group will have gained effective control of Information. As a consequence, the public shareholders will be deprived of their opportunities to realize the higher values obtained in a purchase of such control. As a result, the cancellation of some or all of those shares as part of any final decree would not be a complete or adequate remedy.

Third, Macmillan will incur enormous bank debt, about $1.7 billion, if the restructuring goes forward. The proceeds of the borrowing will be distributed to shareholders as a dividend,[42] and would be irretrievable. Virtually all of the assets of Macmil-

---

**41.**  As earlier noted, First Boston, also acting as a financial advisor to Macmillan, did not furnish an opinion that the restructuring was fair to the public stockholders.

**42.**  It is no answer to argue (as defendants have) that irreparable harm does not exist because the

dividend will benefit shareholders. To obtain the benefit of the dividend, Macmillan's public shareholders must give up the opportunity to receive the larger benefit of a control premium, under circumstances that would make the transaction impossible to rectify.

lan will be pledged to secure the bank debt. There will be no practical way to lift the burden of this debt from the resulting companies if the restructuring is later declared invalid.[43]

Finally, unless the restructuring is enjoined, Macmillan shareholders will lose the opportunity afforded by the $73 cash Bass Group offer and the alternative restructuring proposal that includes additional cash for the public shareholders. *See Anderson, Clayton*, 519 A.2d at 116.

These potential consequences more than adequately establish the threatened irreparable injury required to warrant the remedy of an injunction. *See e.g., Black & Decker*, 682 F.Supp. at 787–88; *Revlon*, 506 A.2d at 185.

Finally, the balance of equities favors the grant of a preliminary injunction. Macmillan's contrary argument appears to be that any injunction will sound the "death knell" of the restructuring, and that as a result, the Bass Group would be able to withdraw their offer but the shareholders would be left without any opportunity to realize value on their investment. However, the Bass Group has represented its willingness to make a tender offer (contingent on Board approval) if an injunction is granted. Moreover, defendants have not shown why if the restructuring is ultimately found to be valid, it could not be revived and allowed to go forward at that time.

## V. CONCLUSION

For the foregoing reasons, a preliminary injunction will issue. Counsel shall promptly confer and present an appropriate form of order implementing the rulings made herein.

---

**43.** Macmillan's shareholders will also be left with highly volatile stub shares in two highly leveraged companies. The defendants admit that the shares may not meet the eligibility requirements for listing on the New York Stock Exchange; and while an over-the-counter trading market may develop, no assurance on that score can be given. *Cf. Norlin Corp. v. Rooney Pace, Inc.*, 744 F.2d 255, 268–269 (2d Cir.1984).